CHRISTENSEN, Justice.
*843 This case requires us to decide whether a motorist who breaks a traffic law may lawfully be stopped if the officer was motivated by investigative reasons for the stop. Around 12:25 a.m., a police officer observed the defendant making an improper turn and decided to follow the defendant. At a stoplight, the officer noticed the defendant's vehicle had an improperly functioning license plate light and ran the vehicle information for the vehicle's registered owner-who was not the defendant. The vehicle information revealed the registered owner's affiliation to gang activity. Subsequently, the officer pulled the defendant over, which led to his discovery of the defendant's open beer container in the center cupholder.
The State charged the defendant with operating while intoxicated in violation of Iowa Code section 321J.2 (2016). The defendant moved to suppress all evidence obtained after the stop, arguing the officer conducted it in violation of the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution because the officer's reasons for the stop were not the traffic violations themselves. The district court denied the motion to suppress and later convicted the defendant following a bench trial on the minutes. Consistent with precedent in Iowa and the vast bulk of authority elsewhere, we affirm the district court judgment because the subjective motivations of an individual officer for making a traffic stop are irrelevant as long as the officer has objectively reasonable cause to believe the motorist violated a traffic law.
I. Background Facts and Proceedings.
On October 17, 2015, Officer Justin Brandt of the Waterloo Police Department observed a black Lincoln Navigator at around 12:25 a.m. in the City of Waterloo. Officer Brandt observed the driver accelerating at a yellow light and passing to the left of a moving vehicle before veering across the centerline. The traffic light changed from yellow to red as the Lincoln Navigator passed through the intersection. Officer Brandt followed the driver to another intersection, where he also observed the driver's license plate light was not properly functioning. At the red light, he ran the vehicle information for the vehicle's registered owner-who was not the driver-and discovered the registered owner's association with local gang activity.
After realizing the registered vehicle owner's gang affiliation, Officer Brandt decided to stop the vehicle. He activated his emergency lights, but the driver continued. The driver eventually stopped the vehicle after Officer Brandt activated his audible siren. Officer Brandt approached the vehicle and immediately smelled an odor of alcohol coming from the driver; he also observed an open can of beer in the center cupholder. The driver denied ownership of the open container but admitted to drinking prior to driving. Officer Brandt obtained the driver's name and date of birth because the driver did not have a license with her. The driver was identified as Scottize Brown. Officer Brandt determined Brown was driving with a suspended license and transported her to the police station, where she failed several field sobriety tests and refused to submit to a breath test.
Brown was charged with a second offense of operating a motor vehicle while intoxicated, an aggravated misdemeanor, *844 in violation of Iowa Code section 321J.2. She filed a motion to suppress on January 15, 2016, claiming she was unlawfully subjected to a pretextual stop in violation of both article I, section 8 of the Iowa Constitution and the Fourth Amendment of the United States Constitution. The district court held a hearing on the motion on February 3, and it denied Brown's motion on February 16, explaining, "Since there were traffic violations that were objectively observed by Officer Brandt, any subjective reasons that may have gone into his decision to stop the vehicle do not matter."
Brown subsequently agreed to a trial on the minutes, and the district court found her guilty on June 21. She was sentenced to incarceration in Black Hawk County jail, "351 days suspended, 14 days imposed," and to probation for one to two years. The district court also ordered Brown to pay a $1875 fine with surcharge, a $10 DARE surcharge, court costs, and attorney fees. Brown appealed on March 7, 2017, requesting that we vacate her conviction and sentence and remand her case for dismissal because she was subjected to an impermissible pretextual stop. We retained Brown's appeal.
II. Standard of Review.
"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." State v. Brown , 890 N.W.2d 315, 321 (Iowa 2017). We examine the entire record and "make an independent evaluation of the totality of the circumstances." State v. Meyer , 543 N.W.2d 876, 877 (Iowa 1996), abrogated in part on other grounds by Knowles v. Iowa , 525 U.S. 113, 115, 118-19, 119 S. Ct. 484, 487, 488, 142 L.Ed.2d 492 (1998). In doing so, we evaluate each case "in light of its unique circumstances." State v. Kurth , 813 N.W.2d 270, 272 (Iowa 2012) (quoting State v. Krogmann , 804 N.W.2d 518, 523 (Iowa 2011) ).
Ineffective-assistance-of-counsel claims are based in the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution. Strickland v. Washington , 466 U.S. 668, 684-86, 104 S. Ct. 2052, 2063-64, 80 L.Ed.2d 674 (1984) ; State v. Schlitter , 881 N.W.2d. 380, 388 (Iowa 2016). We normally preserve ineffective-assistance-of-counsel claims for postconviction-relief proceedings. State v. Harrison , 914 N.W.2d 178, 206 (Iowa 2018). But, "we will address such claims on direct appeal when the record is sufficient to permit a ruling." State v. Wills , 696 N.W.2d 20, 22 (Iowa 2005). We review ineffective-assistance-of-counsel claims de novo. Schlitter , 881 N.W.2d at 388.
III. Analysis.
The United States Supreme Court has established an objective test to evaluate the reasonableness of a traffic stop under the Fourth Amendment of the United States Constitution. In prior cases, we have applied this objective test when evaluating whether law enforcement violated a defendant's Fourth Amendment rights by making a pretextual traffic stop. See State v. Predka , 555 N.W.2d 202, 205 (Iowa 1996) ; see also State v. Cline , 617 N.W.2d 277, 280-81 (Iowa 2000) (en banc), abrogated on other grounds by State v. Turner , 630 N.W.2d 601, 606 n.2 (Iowa 2001). Brown now asks us to take a different approach under the Iowa Constitution. For the reasons explained below, we decline to do so. We first address Brown's constitutional claim, and then turn to her ineffective-assistance-of-counsel claim based on an argument not raised during her motion to suppress in the district court.
*845 A. Subjective Reasons to Stop Motorists.
1. The Fourth Amendment. The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. Whren v. United States , 517 U.S. 806, 809, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89 (1996) ; see also U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...."). Under the Fourth Amendment, the temporary detention of a motorist during a traffic stop is a "seizure," which is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren , 517 U.S. at 809-10, 116 S. Ct. at 1772. Generally, a traffic stop is reasonable when the police have probable cause or reasonable suspicion to believe that the motorist violated a traffic law. Navarette v. California , 572 U.S. 393, 401-02, 134 S. Ct. 1683, 1690, 188 L.Ed.2d 680 (2014) ; Whren , 517 U.S. at 809-10, 116 S. Ct. at 1772 ; State v. Tague , 676 N.W.2d 197, 204 (Iowa 2004).
In Whren , the United States Supreme Court unanimously held that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. at 813, 116 S. Ct. at 1774. In that case, police officers stopped a motorist and his passenger in a "high drug area" after observing the motorist turning without signaling then speed "off at an 'unreasonable speed.' " Id. at 808, 116 S. Ct. at 1772. Upon stopping the motorist, one of the officers observed drugs in the motorist's hands. Id. at 808-09, 116 S. Ct. at 1772. The officers arrested the motorist and his passenger and retrieved various illegal drugs from the vehicle. Id. at 809, 116 S. Ct. at 1772. Both the motorist and his passenger were convicted of violating numerous drug laws and sought to have their convictions reversed, arguing the district court should have granted their suppression motions since the traffic stop was pretextual. Id.
The petitioners in Whren asked the Supreme Court to adopt a different reasonableness test for traffic stops since the traffic code is so expansive that it provides officers with discretion to make pretextual stops based on factors such as race. Id. at 810, 116 S. Ct. at 1773. Specifically, the petitioners claimed the test for traffic stops should be "whether a police officer, acting reasonably, would have made the stop for the reason given." Id. In rejecting petitioners' test, the Supreme Court noted, "Not only have we never held, outside the context of inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary." Id. at 812, 116 S. Ct. at 1774. The Supreme Court "agree[d] with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race." Id. at 813, 116 S. Ct. at 1774. However, it declared "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Id.
The Supreme Court acknowledged the expansive nature of the traffic code and the potential for an "unsettling show of authority" that enforcing such an expansive code created. Id. at 817, 116 S. Ct. at 1776 (quoting Delaware v. Prouse , 440 U.S. 648, 657, 99 S. Ct. 1391, 1398, 59 L.Ed.2d 660 (1979) ). Nevertheless, it was "aware of no principle that would allow [it] to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness *846 of enforcement." Id. at 818, 116 S. Ct. at 1777. It concluded, "[F]or the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure." Id. at 819, 116 S. Ct. at 1777.
On appeal, Brown concedes that the officer's subjective motivations are irrelevant under the Fourth Amendment to the United States Constitution so long as there is probable cause to support the stop. We therefore turn to the question whether the Iowa Constitution forbids stopping a motorist who violated the law if that was not the officer's real reason for the stop.
2. Article I, section 8. The question before us is whether, under the Iowa Constitution, a traffic stop for a traffic violation is "reasonable" even if the violation did not happen to be the officer's motivation for the stop. To put it another way, we must decide whether a motorist who violates a traffic law has a justified expectation that she will be able to continue down the road without interruption unless that violation is the officer's motivation for the stop. As we will explain herein, we do not think article I, section 8 draws such fine lines. It is reasonable to stop a motorist based on reasonable suspicion that the motorist violated the law.
i. Scope of article I, section 8. Article I, section 8 of the Iowa Constitution protects persons against "unreasonable seizures." Iowa Const. art. I, § 8 ("The right of the people to be secure in their persons ... against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause ...."). It should be noted that article I, section 8 and the Fourth Amendment have only minimal textual differences. Article I, section 8 employs a semicolon between the reasonableness and warrant clauses while the Fourth Amendment uses a comma between these two clauses.[1] State v. Gaskins , 866 N.W.2d 1, 6 (Iowa 2015).
Current members of our court have disagreed about the semicolon's significance. Compare State v. Short , 851 N.W.2d 474, 483 (Iowa 2014) ("This semicolon suggests the framers believed that there was a relationship between the reasonableness clause and the warrant clause ...."), with id. at 522 (Mansfield, J., dissenting) ("I do not think one can use this inconsequential punctuation difference to justify a different interpretation of article I, section 8."). "One expects that, if the semicolon in [a]rticle I, section 8 fundamentally altered the meaning of that provision, this argument [over differences in punctuation marks] would have emerged at some point within the first 150 years ...." Gaskins , 866 N.W.2d at 52 n.27 (Waterman, J., dissenting).
There is also evidence in the 1857 debates over the Iowa Constitution that our framers wanted our bill of rights to provide similar protection to the Federal Bill of Rights when they adopted similar language. For example, George W. Ells proposed an amendment at the convention to include a counterpart to the Federal Due Process Clause in the Iowa Constitution, noting, "[T]he committee who have offered the amendment to this second section, did so from a desire that the Bill of Rights in the Constitution of this State, should be as strong, in this respect, as the Constitution of the United States." 1 The Debates of the Constitutional Convention of the State of Iowa 101-02 (W. Blair Lord rep., 1857), https://www.statelibraryofiowa.org/services/collections/law-library/iaconst *847 (emphasis added). Ellis noted his desire for his proposed due process amendment for the Iowa Constitution to be verbatim to the Federal Due Process Clause. Id. at 101. If the framers of the Iowa Constitution wanted to create greater search and seizure protections for Iowans, the nearly identical language of article I, section 8 to the Fourth Amendment does not reflect this desire.
We generally "interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment" because of their nearly identical language. State v. Christopher , 757 N.W.2d 247, 249 (Iowa 2008). Nevertheless, we acknowledge our duty to interpret article I, section 8 independently. See Cline , 617 N.W.2d at 292-93. "We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose." State v. Brooks , 888 N.W.2d 406, 410-11 (Iowa 2016) (quoting State v. Jackson , 878 N.W.2d 422, 442 (Iowa 2016) ).
However, as to article I, section 8, we are not writing on a blank slate. In State v. Griffin , 691 N.W.2d 734 (Iowa 2005), which was decided after Cline , we ruled unanimously as follows:
We now hold that our pronouncement in Meyer was not only a correct application of federal law but also accurately described the validity of a pretextual arrest under article I, section 8 of the Iowa Constitution for purposes of sustaining a search incident to that arrest. If probable cause exists for an arrest to be made, the motive for making the arrest does not limit the right to conduct a search incident thereto.
Id. at 737. And in State v. Kreps , 650 N.W.2d 636 (Iowa 2002), also decided after Cline , we said,
The motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. The officer is therefore not bound by his real reasons for the stop.
Id. at 641 (citation omitted).[2] So, the question today is whether we should overturn our article I, section 8 precedent.
As already noted, we have similarly held under article I, section 8 that "the motive for making the arrest does not limit the right to conduct a search incident thereto" under the Iowa Constitution "[i]f probable cause exists for an arrest to be made." Griffin , 691 N.W.2d at 737. In Griffin , an officer stopped the defendant due to an improperly illuminated rear license plate and an excessively loud muffler. Id. at 736. The officer's "computer check indicated a recent prior conviction for failing to have proof of liability insurance for the vehicle he was driving and prior drug-related arrests." Id. The defendant informed the officer that he did not have liability insurance, and the officer arrested the defendant for all three traffic violations he observed. Id. The officer's search of the vehicle incident to arrest revealed drugs, and the officer testified at the suppression hearing that he would not have arrested the defendant if he had not suspected the vehicle contained drugs based on the defendant's prior drug convictions. Id. We rejected the defendant's *848 claim that the evidence obtained from the search should have been suppressed because it was obtained incident to a pretextual arrest in violation of article I, section 8 of the Iowa Constitution. Id. at 735-36.
Brown asks us to decline to follow our approach Griffin and Kreps in evaluating the constitutionality of pretextual traffic stops under the Iowa Constitution.
ii. Brown's proposed burden-shifting framework. Brown proposes that we interpret article I, section 8 more broadly than the Fourth Amendment and adopt a burden-shifting test for evaluating traffic stops. Under this burden-shifting test, a court would allow the State to provide an objective basis for the stop, allow the defendant to rebut that with evidence of subjective motivation, and then allow the State to come forward and show that the objective basis was the real reason for the stop. We find this test unworkable for a number of reasons.
First, Brown's proposed burden-shifting test is difficult to administer. While this test appears objective on its face, it is ultimately a subjective standard that focuses on the officer's state of mind at the time of the traffic stop. " '[O]bjective evidence' of ... general police practice is simply an aggregation of the subjective intentions of officers in the regions." United States v. Ferguson , 8 F.3d 385, 391 (6th Cir. 1993). For example, in Iowa, police practices can range from county to county. The usual practice of police officers in Polk County may not represent the usual practice of police officers in Shelby County, as the problems police officers must regularly confront in the course of their job duties quite possibly differ between rural and urban counties. Likewise, what may seem like a common and reasonable practice for a narcotics officer may seem unreasonable to the highway patrolman. Consequently, the reasonableness, and thus the validity, of the officer's traffic stop may turn on the county in which it is made or the detaining officer's law enforcement division. Yet, the search and seizure protections of article I, section 8 and the Fourth Amendment do not vary, nor "can [they] be made to turn upon such trivialities." Whren , 517 U.S. at 815, 116 S. Ct. at 1775.
Brown's burden-shifting test also fails to consider that there are often a number of factors influencing an officer's decision-making process. We have previously concluded that parking in a frequently burglarized area can lead to an officer's decision to stop a motorist. State v. Richardson , 501 N.W.2d 495, 497 (Iowa 1993) (per curiam). So, too, can pouring a can of beer out onto the pavement of a tavern parking lot at "a time notorious for drunken driving." State v. Rosenstiel , 473 N.W.2d 59, 62 (Iowa 1991), overruled on other grounds by Cline , 617 N.W.2d at 281. It is unclear under the proposed burden-shifting test when these situations become pretextual. Our search and seizure jurisprudence requires more certainty and uniformity than the burden-shifting test provides.
Second, Brown bases her request for a burden-shifting test on concerns of racial profiling. Brown does not argue that Officer Brandt knew she was African-American before initiating the traffic stop. Instead, the observed traffic violations precipitated Officer Brandt discovering the vehicle's registered owner's gang affiliation. A key element that often defines gangs or gang behavior is "violent or criminal behavior as a major activity of group members." William B. Sanders, Gangbangs and Drive-Bys 10 (1994).
Though we acknowledge that police discretion can lead to racial profiling, we are not persuaded that Brown's approach would have any significant impact on eliminating *849 racial profiling. Racial profiling concerns existed when we decided Griffin , and many of the racial profiling studies Brown cites predate Griffin . An officer who engages in racial profiling is also likely to be willing to lie about it. We are hopeful, though, that the spread of technology such as body cams, dash cams, and cell phone videos taken by private citizens will enable our society to better monitor and reduce racial profiling in the future.
Third, the burden-shifting test is also unnecessary to protect citizens from unlawful searches and seizures. "[T]he harsh reality [is] that we lack the ability to control all the variables leading to disparate enforcement. In few areas is this more observable than in our criminal justice system." Jeff D. May et al., Pretext Searches and Seizures: In Search of Solid Ground , 30 Alaska L. Rev. 151, 184-85 (2013) [hereinafter May et al.]. The criminal justice system is rife with "so many variables that influence who becomes subject to prosecution that it is difficult to isolate any one causal source of the disparate representation we see in our statistics." Id. at 185. Because of the numerous factors influencing law enforcement, especially regarding areas of the law as expansive as the traffic code, "[t]here is real doubt that we will ever eradicate the use of pretext motivations even if we were to prohibit them." Id.
Law enforcement officers "make judgments and mental shortcuts based on [their] past experiences and training." Id. It appears "somewhat easier to figure out the intent of an individual officer than to plumb the collective consciousness of law enforcement in order to determine whether a 'reasonable officer' would have been moved to act upon the traffic violation." Whren , 517 U.S. at 815, 116 S. Ct. at 1775. Brown's approach of effectively prohibiting pretextual stops outright only risks "push[ing] its use further into the shadows." May et al., 30 Alaska L. Rev. at 185.
This case involves a relatively common scenario where a late-night traffic stop based on an observed violation of the traffic code leads to a determination that the driver was intoxicated and to an OWI conviction. Although it is our job to interpret the Iowa Constitution and not to set policy for the State of Iowa, we think most Iowans favor this policy outcome and would not want reduced enforcement of the drunk driving laws.
Iowa law already provides motorists with protections meant to curtail law enforcement's abuse of authority during traffic stops. Under article I, section 8 of the Iowa Constitution, the officer must allow a motorist to leave "when the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion." State v. Coleman , 890 N.W.2d 284, 301 (Iowa 2017). Iowa also restricts the scope of the search-incident-to-arrest exception to the warrant requirement under the Iowa Constitution to limit law enforcement's ability to gather evidence incident to arrest. See Gaskins , 866 N.W.2d at 16-17. Thus, officers may not rely on the search-incident-to-arrest exception to search a motorist's vehicle on the grounds that the officers believe the vehicle contains evidence of the arresting offense. Id. at 13-14. We even analyze a motorist's consent to the search of a vehicle during a traffic stop more rigorously in Iowa. See State v. Pals , 805 N.W.2d 767, 782-83 (Iowa 2011) (applying a narrow version of the federal totality-of-the-circumstances test in determining consent was involuntary). These additional protections for motorists in Iowa help limit the potential for an abuse of authority that Brown is concerned with reducing.
All of this is not to say that the officer's subjective motivations are never relevant in determining the validity of a *850 traffic stop. "The more evidence that a detention was motivated by police suspicions unrelated to the traffic offense, the less credible the officer's assertion that the traffic offense occurred." State v. Lopez , 873 P.2d 1127, 1138-39 (Utah 1994). The district court considers the officer's credibility in determining at the suppression hearing whether the facts justified the officer's traffic stop at its inception. If the district court doubts the officer's credibility and finds the motorist did not commit a traffic violation, then the stop is unconstitutional. In the event of an unconstitutional traffic stop based on a claim of selective enforcement, the Equal Protection Clause-not the State or Federal Search and Seizure Clause-is the proper claim to bring when seeking recourse. Whren , 517 U.S. at 813, 116 S. Ct. at 1774. To be certain, the Equal Protection Clause prohibits selective enforcement of the law based on racially discriminatory grounds. See, e.g. , id. ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."); United States v. Coney , 456 F.3d 850, 856 n.4 (8th Cir. 2006) ; United States v. Frazier , 408 F.3d 1102, 1108 (8th Cir. 2005) ; Johnson v. Crooks , 326 F.3d 995, 999-1000 (8th Cir. 2003) ; Chavez v. Ill. State Police , 251 F.3d 612, 635 (7th Cir. 2001) ; Gardenhire v. Schubert , 205 F.3d 303, 319-20 (6th Cir. 2000) ; United States v. Bell , 86 F.3d 820, 823 (8th Cir. 1996) ; United States v. Benitez , 613 F. Supp. 2d 1099, 1101-02 (S.D. Iowa 2009) ; In re Prop. Seized from Kaster , 454 N.W.2d 876, 880 (Iowa 1990) (en banc); State v. Durrell , 300 N.W.2d 134, 135-36 (Iowa 1981) ; State v. Walker , 236 N.W.2d 292, 295 (Iowa 1975).
Brown's request for a departure from Griffin and Kreps and adoption of a burden-shifting framework for evaluating traffic stops would create instability in the law, hinder law enforcement efforts, weaken the strength of our adversarial system, and undermine public confidence in the legal system. This kind of burden-shifting may work well in employment discrimination law, where there will usually be a fairly detailed record to evaluate, but it would be a challenge to apply in the thousands of suppression hearings where the legality of split-second actions are at issue.
iii. Other states' approaches. Not only does our article I, section 8 precedent hold that traffic stops for traffic violations are reasonable regardless of the officer's subjective motivation, but the vast majority of other jurisdictions agree with us. In addition to Iowa, forty states and the District of Columbia follow the same objective standard we outlined in Griffin and Kreps .[3] Brown points to only three states *852 that have adopted a different standard,[4] and only two of these states have adopted her proposed burden-shifting test.[5] Yet, these states have either subsequently disavowed their new standard or reached that new standard based on a state constitutional provision different from the Iowa Constitution.
For example, Brown's reliance on the Superior Court of Delaware's holding in *853 State v. Heath , 929 A.2d 390 (Del. Super. Ct. 2006), overlooks the fact that subsequent Delaware decisions have declined to follow Heath because "[t]here are too many occasions where ... there was a lawful basis to stop a motor vehicle for a traffic violation which led later to arrests for other kinds of offenses." State v. Adams , 13 A.3d 1162, 1166-67 (Del. Super. Ct. 2008). The Delaware Supreme Court has recognized that " Heath has not been followed in any other Superior Court decisions." Turner v. State , 25 A.3d 774, 777 (Del. 2011) (en banc).
Further, Brown's reliance on the Court of Appeals of New Mexico's holding in State v. Ochoa , 146 N.M. 32, 206 P.3d 143 (Ct. App. 2008) ignores the heightened expectation of privacy New Mexico courts have provided to motorists in an automobile that Iowa does not afford. The court of appeals in Ochoa specifically noted that this heightened privacy expectation " 'is a distinct characteristic of New Mexico constitutional law' and therefore supports our departure from Whren ." Id. at 151 (quoting State v. Cardenas-Alvarez , 130 N.M. 386, 25 P.3d 225, 231 (2001) ). In contrast, we have declined to provide motorists with this same expectation of privacy in their automobiles and acknowledged "the reduced expectation of privacy [in automobiles] resulting from the 'configuration, use and regulation of automobiles.' " State v. Storm , 898 N.W.2d 140, 146 (Iowa 2017) (quoting Arkansas v. Sanders , 442 U.S. 753, 761, 99 S. Ct. 2586, 2591, 61 L.Ed.2d 235 (1979), abrogated on other grounds by California v. Acevedo , 500 U.S. 565, 575, 111 S. Ct. 1982, 1989, 114 L.Ed.2d 619 (1991) ).
Finally, Brown's representation of the Washington Supreme Court's holding in State v. Ladson , 138 Wash.2d 343, 979 P.2d 833, 836 (1999) (en banc), as another persuasive example of departure from Whren under a state constitution, disregards the substantially different search and seizure provision of the Washington Constitution. Specifically, article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. I, § 7. As the court noted in Ladson , this provision "is explicitly broader than that of the Fourth Amendment" and operates under a different mechanism regarding the citizens' expectations of privacy. Ladson , 979 P.2d at 837. Given the differences between the Washington Constitution's search and seizure provision and that of the Iowa Constitution, Ladson carries little persuasive value in how we should decide this case.
In any event, Washington's approach "has not resulted in ... significantly greater protections" from racial profiling. Margaret M. Lawton, The Road to Whren and Beyond: Does the "Would Have" Test Work? , 57 DePaul L. Rev. 917, 920 (2008). Rather, state courts in Washington continue to do "what courts have always done under the [ Whren ] test: determining the credibility of police officers and relying upon the totality of the circumstances in deciding whether a traffic stop was constitutionally permissible." Id. at 919. In doing so, they rarely find pretextual motivations for the officer's stop "unless the officer either testifies to her use of pretext or the court finds that the officer is lying about the reasons for the stop, both of which are relatively uncommon." Id. at 957.
In fact, the Washington Supreme Court more recently has retreated from Ladson and said that it will uphold a stop for a traffic violation "even if the legitimate reason for the stop is secondary and the officer is motivated primarily by a hunch or some other reason that is insufficient to justify a stop."
*854 State v. Arreola , 176 Wash.2d 284, 290 P.3d 983, 991 (2012) (en banc); see also State v. Alvarez , 6 Wash.App.2d 398, 430 P.3d 673, 677 (2018) (Lawrence-Berrey, C.J., dissenting) ("It is clear that law enforcement can conduct an investigatory stop for traffic infractions.").
We conclude that the objective test articulated in Whren applies to constitutional challenges to traffic stops under article I, section 8 of the Iowa Constitution. Interpreting article I, section 8 coextensive with the Fourth Amendment in this case "ensure[s] that the validity of such stops is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note." Ferguson , 8 F.3d at 392. At the same time, it does not insulate people engaged in more egregious criminal activity "from criminal liability for those activities simply because a judge determines that the police officer who executed the traffic stop, had he been the mythical reasonable officer, would not have stopped them" for the traffic violation they committed. Id. Moreover, the objective standard set forth in Griffin and Kreps provides law enforcement officers with a degree of certainty that they are acting appropriately when they choose to enforce the traffic violations they witness. We should not penalize law enforcement for enforcing the law.
Our holding today recognizes this need for consistency by adhering to our prior holdings. See Brewer-Strong v. HNI Corp. , 913 N.W.2d 235, 249 (Iowa 2018) ("From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." (quoting McElroy v. State , 703 N.W.2d 385, 394 (Iowa 2005) )); see also Book v. Doublestar Dongfeng Tyre Co. , 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law."). Stare decisis "is an important restraint on judicial authority and provides needed stability in and respect for the law." Kiesau v. Bantz , 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting), overruled on other grounds by Alcala v. Marriott Int'l Inc. , 880 N.W.2d 699, 708 & n.3 (Iowa 2016). Though it is "our role as a court of last resort ... to occasionally reexamine our prior decisions, we must undertake this weighty task only for the most cogent reasons and with the greatest caution." Id.
We decided Griffin under the Iowa Constitution less than fifteen years ago, in which we made clear that an officer's ulterior "motive for making the arrest does not limit the right to conduct a search incident thereto" under the Iowa Constitution "[i]f probable cause exists for an arrest to be made." 691 N.W.2d at 737. Despite recognizing that we were not bound by Fourth Amendment precedent, we nevertheless "found no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the [F]ederal [C]onstitution under the facts of [the] case." Id. Brown provides no new arguments that show our holding in Griffin , or our approval of Whren in Predka , was clearly erroneous. See Brewer-Strong , 913 N.W.2d at 249 ("This highest possible showing [for overruling precedent] requires a demonstration that the precedent is clearly erroneous.").
B. Brown's Ineffective-Assistance-of-Counsel Claim. Brown acknowledges her trial counsel did not specifically address her claim on appeal that Officer Brandt lacked probable cause for the stop because she did not violate any traffic laws. However, she asks the court to analyze this issue under an ineffective-assistance-of-counsel claim. The record before us is sufficient to *855 address Brown's ineffective-assistance claim, and we proceed to consider her claim.
To succeed on her ineffective-assistance-of-counsel claim, Brown must prove (1) counsel failed to perform an essential duty and (2) prejudice resulted. State v. Hopkins , 576 N.W.2d 374, 378 (Iowa 1998). To establish the first prong, Brown must show her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland , 466 U.S. at 687, 104 S. Ct. at 2064. We approach the first prong with the presumption counsel performed her duties competently; "we measure counsel's performance against the standard of a reasonably competent practitioner." State v. Maxwell , 743 N.W.2d 185, 195 (Iowa 2008). Although not required to predict changes in the law, "counsel must 'exercise reasonable diligence in deciding whether an issue is "worth raising." ' " State v. Dudley , 766 N.W.2d 606, 620 (Iowa 2009) (quoting State v. Westeen , 591 N.W.2d 203, 210 (Iowa 1999) ). Counsel is not burdened with the duty to raise an issue that has no merit. Id. ; see also State v. Schaer , 757 N.W.2d 630, 637 (Iowa 2008). The second prong-prejudice-results when "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." Wills , 696 N.W.2d at 22 (quoting Hopkins , 576 N.W.2d at 378 ).
Because we did not find a basis to diverge from the protection afforded by the Iowa Constitution from that afforded by the United States Constitution under the facts of this case, our analysis will apply equally to both state and federal grounds. See Iowa Const. art. I, § 10 ; State v. Nitcher , 720 N.W.2d 547, 553 (Iowa 2006).
If a traffic violation occurred, and the peace officer witnessed it, the State has established probable cause.[6] State v. Tyler , 830 N.W.2d 288, 292 (Iowa 2013) ; see also United States v. Mendoza , 677 F.3d 822, 827 (8th Cir. 2012) ; Tague , 676 N.W.2d at 201 ("When a peace officer observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist."). However, the State must bear the burden of proof by a preponderance of the evidence that the officer had probable cause to stop the vehicle. Tyler , 830 N.W.2d at 293. If the State does not meet this burden, all evidence obtained at the stop must be suppressed. State v. Louwrens , 792 N.W.2d 649, 651-52 (Iowa 2010). "The existence of probable cause for a traffic stop is evaluated 'from the standpoint of an objectively reasonable police officer.' " Tyler , 830 N.W.2d at 293-94 (quoting Ornelas v. United States , 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-62, 134 L.Ed.2d 911 (1996) ).
Brown claims her trial counsel was ineffective for failing to challenge the establishment of probable cause for the stop. She concedes her trial counsel did properly challenge the legality of a pretextual stop, but ultimately failed to address the required probable cause. The State responds to the ineffective-assistance claim by indicating a peace officer witnessed the multiple traffic violations Brown committed. Specifically, that Brown acted in violation of Iowa Code section 321.257, thereby providing probable cause for the stop.
*856 At the suppression hearing, Officer Brandt testified to witnessing Brown in violation of multiple traffic laws prior to initiating the stop. Foremost, Officer Brandt observed Brown's vehicle accelerate through an intersection after the traffic-control signal changed from yellow to red. This is in clear violation of Iowa's regulation of vehicular traffic. See Iowa Code § 321.257. A yellow light "means vehicular traffic is warned that the related green movement is being terminated and vehicular traffic shall no longer proceed into the intersection and shall stop." Id. § 321.257(2)(b ). A red light "means vehicular traffic shall stop." Id. § 321.257(2)(a ). This traffic violation alone, however minor, is sufficient probable cause to stop a motorist. Tague , 676 N.W.2d at 201. It is undisputed Officer Brandt witnessed this traffic violation while queued at the same intersection Brown accelerated through. The State carried its burden. See Tyler , 830 N.W.2d at 293 ; see also Mendoza , 677 F.3d at 827. Officer Brandt's stop of Brown's vehicle was based on probable cause-violation of Iowa Code section 321.257. For that reason, Brown's trial counsel was not ineffective for failing to challenge probable cause. See Nitcher , 720 N.W.2d at 555 (noting trial counsel was not ineffective for failing to raise an issue with no merit). Accordingly, Brown has failed to establish the first prong of her ineffective-assistance-of-counsel claim, and her claim must fail. See Hopkins , 576 N.W.2d at 380 (acknowledging failure to prove either ineffective-assistance prong is fatal to the claim).
IV. Conclusion.
We affirm the district court decision for the aforementioned reasons.
AFFIRMED.
Waterman, Mansfield, and McDonald, JJ., join this opinion. McDonald, J., files a separate concurring opinion. Cady, C.J., files a dissenting opinion in which Wiggins, J., joins. Appel, J., files a separate dissenting opinion in which Wiggins, J., joins.
McDONALD, Justice (concurring specially).
Scottize Brown failed to establish a violation of her rights arising under the Federal or Iowa Constitutions, and the district court did not err in denying Brown's motion to suppress. I thus concur in Justice Christensen's opinion affirming Brown's conviction and sentence. I write separately to address Brown's argument the Federal Constitution sets the floor for claims arising under the Iowa Constitution.
I.
"Beginning in the 1960s ..., a growing number of states began to rediscover the independent nature of their state constitutional provisions. [This movement is s]ometimes called the 'new judicial federalism' ...." State v. Baldon , 829 N.W.2d 785, 814 (Iowa 2013) (Appel, J., specially concurring). In 1977, Justice William Brennan galvanized this movement with "his call to arms for state courts." Id. at 790 (majority opinion); see William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights , 90 Harv. L. Rev. 489, 503 (1977). Several decades after Justice Brennan's call to arms, this court began to systematically address legal questions arising under the Iowa Constitution.
The fundamental premise of this court's most recent jurisprudence in the area of state constitutional law has been that "although this court cannot interpret the Iowa Constitution to provide less protection than that provided by the United States Constitution, the court is free to interpret our constitution as providing *857 greater protection for our citizens' constitutional rights." State v. Cline , 617 N.W.2d 277, 285 (Iowa 2000) (en banc), abrogated on other grounds by State v. Turner , 630 N.W.2d 601, 606 n.2 (Iowa 2001). Pursuant to this premise, this court has treated the Iowa Constitution as a one-way ratchet to provide only greater rights and remedies than a parallel provision of the United States Constitution. See, e.g. , Behm v. City of Cedar Rapids , 922 N.W.2d 524, 566 (Iowa 2019) ("As a result, we apply the substantive federal standards, reserving the right to apply these standards in a more stringent fashion than under federal caselaw."); Schmidt v. State , 909 N.W.2d 778, 793 (Iowa 2018) ("The Iowa Constitution affords individuals greater rights than does the United States Constitution."); State v. Pettijohn , 899 N.W.2d 1, 26 (Iowa 2017) ("In assessing that caselaw, we remain mindful that decisions of the Supreme Court addressing the scope of a right guaranteed by the United States Constitution set a floor below which the scope of a right guaranteed by the Iowa Constitution may not fall, but not a ceiling above which it may not rise."); State v. Sweet , 879 N.W.2d 811, 832 (Iowa 2016) ("In any event, the rulings of the United States Supreme Court create a floor, but not a ceiling, when we are called upon to interpret parallel provisions of the Iowa Constitution."); Nguyen v. State , 878 N.W.2d 744, 755 (Iowa 2016) ("We are free to interpret our constitution more stringently than its federal counterpart, providing greater protection for our citizens' constitutional rights."); Baldon , 829 N.W.2d at 791 & n.1 ("[T]he Supreme Court's jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment-or any other fundamental, civil, or human right for that matter-makes for an admirable floor, but it is certainly not a ceiling.... The incorporation doctrine commands that we no longer use independent state grounds to sink below the federal floor.").
The fundamental premise of our recent jurisprudence is not sound. This court is free to interpret our constitution to provide less or more protection than the Federal Constitution. See State v. Hampton , No. 18-0061, 2019 WL 476471, at *1-3 (Iowa Ct. App. Feb. 6, 2019) (explaining Iowa courts can interpret the state constitution to provide less protection than the Federal Constitution); State v. Halverson , No. 16-1614, 2017 WL 5178997, at *3 (Iowa Ct. App. Nov. 8, 2017) (explaining the relevant question is what the state constitutional text means and how it applies to the facts and circumstances of the case at hand and not whether Iowa courts should interpret the Iowa Constitution "more strictly" or "more broadly" than the Federal Constitution); State v. Bohl , No. 151546, 2016 WL 4543957, at *1-2 (Iowa Ct. App. Aug. 31, 2016) ("Depending upon the particular issue, our precedents interpreting article I, section 8 may provide greater or lesser protection than cases interpreting the Fourth Amendment."); State v. Barth , No. 141929, 2016 WL 740302, at *3 (Iowa Ct. App. Feb. 24, 2016) ("Barth contends the Iowa Constitution provides greater protection than the Federal Constitution without specifying why or how. Regardless, Barth misstates the issue. Depending upon the particular issue, our precedents interpreting article I, section 8 may provide greater or lesser protection than cases interpreting the Fourth Amendment.").
The conclusion that this court can interpret the Iowa Constitution to provide less or more protection than a parallel provision of the Federal Constitution is inherent in the federal system. The Bill of Rights, in and of itself, applies only to the federal government. See *858 Timbs v. Indiana , --- U.S. ----, 139 S. Ct. 682, 687, 203 L.Ed.2d 11 (2019) ("When ratified in 1791, the Bill of Rights applied only to the Federal Government."); Danforth v. Minnesota , 552 U.S. 264, 269, 128 S. Ct. 1029, 1034, 169 L.Ed.2d 859 (2008) ; Barron v. Mayor & City Council of Baltimore , 32 U.S. (7 Pet.) 243, 247, 8 L.Ed. 672 (1833). The Supreme Court is the final arbiter of the meaning of the Federal Constitution. In contrast, the Iowa Constitution applies to the state government. This court is the final arbiter of the meaning of the Iowa Constitution. See Minnesota v. Nat'l Tea Co. , 309 U.S. 551, 557, 60 S. Ct. 676, 679, 84 L.Ed. 920 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."). In determining the meaning of state constitutional law, this court has a duty to independently determine the meaning of the Iowa Constitution. See State v. Gaskins , 866 N.W.2d 1, 7 (Iowa 2015). This is true whether we interpret the Iowa Constitution to provide less or more protection than the Federal Constitution.
Brown's contention that the incorporation doctrine dictates the minimum required content of state constitutional law misapprehends the incorporation doctrine. Incorporation did not change the substantive content of state constitutional law; it changed the substantive content of federal constitutional law. Specifically, the Supreme Court held the Due Process Clause of the Fourteenth Amendment incorporated most of the Bill of Rights. See Timbs , --- U.S. ----, 139 S. Ct. at 687 ("With only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." (quoting McDonald v. City of Chicago , 561 U.S. 742, 765, 130 S. Ct. 3020, 3035, 177 L.Ed.2d 894 (2010) )). "Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.' " Id. (quoting McDonald , 561 U.S. at 765, 130 S. Ct. at 3035 ). Pursuant to the Supremacy Clause, this court is bound to apply the Supreme Court's Fourteenth Amendment jurisprudence to resolve claims arising under the Fourteenth Amendment. See Armstrong v. Exceptional Child Ctr., Inc. , --- U.S. ----, 135 S. Ct. 1378, 1383, 191 L.Ed.2d 471 (2015) (explaining the Supremacy Clause is not a source of substantive rights but instead provides for a federal rule of decision where a litigant asserts a federal claim). The Supreme Court's Fourteenth Amendment jurisprudence does not dictate the substance of the state law or the remedy for any violation of the same. See Virginia v. Moore , 553 U.S. 164, 178, 128 S. Ct. 1598, 1608, 170 L.Ed.2d 559 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law. That Amendment does not require the exclusion of evidence obtained from a constitutionally permissible arrest."); Fuller v. Oregon , 417 U.S. 40, 48 n.9, 94 S. Ct. 2116, 2122 n.9, 40 L.Ed.2d 642 (1974) ("[T]he dissent purports to resolve questions of state [constitutional] law that this Court does not have power to decide."); Nat'l Tea Co. , 309 U.S. at 557, 60 S. Ct. at 679 ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."); see also Collins v. Virginia , --- U.S. ----, 138 S. Ct. 1663, 1680 n.6, 201 L.Ed.2d 9 (2018) (Thomas, J., concurring) ("[T]he States are free to adopt their own exclusionary rules as a matter of state law. But nothing in the Federal Constitution requires them to do so."); Massachusetts v. Upton , 466 U.S. 727, 738, 104 S. Ct. 2085, 2091, 80 L.Ed.2d 721 (1984) (per curiam) (Stevens, J., concurring in the judgment).
*859 This understanding that incorporation does not dictate the meaning of state law is supported by former Oregon Supreme Court Justice Hans Linde. Justice Linde is widely considered the "intellectual godfather" of the new judicial federalism. James A. Gardner, The Failed Discourse of State Constitutionalism , 90 Mich. L. Rev. 761, 774 (1992) (quoting Ronald K.L. Collins, Forward: The Once "New Judicial Federalism" & Its Critics , 64 Wash. L. Rev. 5, 5 (1989) ). Members of this court have favorably cited the work of Justice Linde when interpreting the Iowa Constitution. See Gaskins , 866 N.W.2d at 55 (Waterman, J., dissenting) (citing Hans A. Linde, First Things First: Rediscovering the States' Bills of Rights , 9 U. Balt. L. Rev. 379, 392 (1980) [hereinafter Linde, First Things First ] ); Baldon , 829 N.W.2d at 821 (Appel, J., specially concurring) (quoting Justice Linde's opinion in State v. Kennedy , 295 Or. 260, 666 P.2d 1316, 1322 (Or. 1983) ). In Baldon , Justice Appel noted Justice Linde was an "extraordinary state court judge[ ] with [an] outstanding reputation[ who] ha[s] helped to develop what is now a substantial body of independent state constitutional law." 829 N.W.2d at 828. He further noted there was "no basis to discount the work of th[is] outstanding state supreme court justice[ ]." Id. He also lauded Justice Linde's outstanding extrajudicial scholarship. See id. at 828 n.23 (citing Hans A. Linde, E Pluribus-Constitutional Theory and State Courts , 18 Ga. L. Rev. 165 (1984) [hereinafter Linde, E Pluribus ]; Linde, First Things First , 9 U. Balt. L. Rev. 379).
Justice Linde has concluded in both his judicial and extrajudicial work that state courts are free to interpret a parallel provision of a state constitution as providing less protection than the Federal Constitution:
The state argues, correctly, that diversity does not necessarily mean that state constitutional guarantees always are more stringent than decisions of the Supreme Court under their federal counterparts. A state's view of its own guarantee may indeed be less stringent, in which case the state remains bound to whatever is the contemporary federal rule. Or it may be the same as the federal rule at the time of the state court's decision, which of course does not prevent that the state's guarantee will again differ when the United States Supreme Court revises its interpretation of the federal counterpart. The point is not that a state's constitutional guarantees are more or less protective in particular applications, but that they were meant to be and remain genuine guarantees against misuse of the state's governmental powers, truly independent of the rising and falling tides of federal case law both in method and in specifics.
Kennedy , 666 P.2d at 1323. Stated differently,
The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The state's law may prove to be more protective than federal law. The state law also may be less protective. In that case the court must go on to decide the claim under federal law, assuming it has been raised.
Linde, E Pluribus , 18 Ga. L. Rev. at 179.
The Michigan Supreme Court reached the same conclusion in Sitz v. Department of State Police , 443 Mich. 744, 506 N.W.2d 209, 216-17 (Mich. 1993). That court's discussion of the issue is worth quoting at length here:
*860 [A]ppropriate analysis of our constitution does not begin from the conclusive premise of a federal floor. Indeed, the fragile foundation of the federal floor as a bulwark against arbitrary action is clearly revealed when, as here, the federal floor falls below minimum state protection. As a matter of simple logic, because the texts were written at different times by different people, the protections afforded may be greater, lesser, or the same.
Id. at 217 (footnote omitted). The court continued,
The image of federal constitutional law as a "floor" in state court litigation pervades most commentary on state constitutional law. Commentators contend that in adjudicating cases, state judges must not adopt state constitutional rules which fall below this floor; courts may, however, appeal to the relevant state constitution to establish a higher "ceiling" of rights for individuals....
Certainly, as a matter of federal law, state courts are bound not to apply any rule which is inconsistent with decisions of the Supreme Court; the Supremacy Clause of the Federal Constitution clearly embodies this mandate. It would be a mistake, however, to view federal law as a floor for state constitutional analysis; principles of federalism prohibit the Supreme Court from dictating the content of state law. In other words, state courts are not required to incorporate federally-created principles into their state constitutional analysis; the only requirement is that in the event of an irreconcilable conflict between federal law and state law principles, the federal principles must prevail.
....
[S]uch courts must undertake an independent determination of the merits of each claim based solely on principles of state constitutional law. If the state court begins its analysis with the view that the federal practice establishes a "floor," the state court is allowing a federal governmental body-the United States Supreme Court-to define, at least in part, rights guaranteed by the state constitution.
Id. at 217 n.12 (alterations in original) (quoting Earl M. Maltz, False Prophet-Justice Brennan and the Theory of State Constitutional Law , 15 Hastings Const. L.Q. 429, 443-44 (1988)).
Other courts have reached the same conclusion. See State v. Oliver , 188 Ga.App. 47, 372 S.E.2d 256, 259 (Ga. Ct. App. 1988) ("If anything, the Georgia Constitution is less protective than the Fifth Amendment, for it recognizes an exception to the bar against double jeopardy when the first trial ends in a mistrial."); State v. Jackson , 348 N.C. 644, 503 S.E.2d 101, 103-04 (N.C. 1998) ("Strictly speaking, however, a state may still construe a provision of its constitution as providing less rights than are guaranteed by a parallel federal provision."); Alva State Bank & Tr. Co. v. Dayton , 755 P.2d 635, 638 (Okla. 1988) (per curiam) (recognizing that if the state constitution provides less protection than federal law, then "the question must be determined by federal law"); Ex parte Tucci , 859 S.W.2d 1, 32 n.34 (Tex. 1993) (Phillips, C.J., concurring) ("Literally read, this position makes no logical sense. If our text was written at a different time by different people with different concerns, then the protection it affords may be greater, lesser, or the same as that provided by a different provision in the United States Constitution."); Hulit v. State , 982 S.W.2d 431, 436-37 (Tex. Crim. App. 1998) (en banc) ("The Supremacy Clause means that, in practical terms, persons will always be able to avail themselves of the greater *861 right. This is very important to litigants and their counsel, who are naturally and properly result-oriented. But it does not mean that a court, faithfully interpreting state laws, can only find in them protections that equal or exceed federal laws."); State v. Briggs , 199 P.3d 935, 942 (Utah 2008) (recognizing state law may "provide a lesser level of protection," in which case the court addresses the federal claim).
I thus conclude this court has a duty to independently interpret the Iowa Constitution. This court discharges that duty by looking to the text of the document through the prism of our precedent, tradition, and custom. This court's interpretation of the Iowa Constitution may be the same as the Supreme Court's interpretation of a parallel provision of the Federal Constitution. This court's interpretation of the Iowa Constitution may be different than the Supreme Court's interpretation of a parallel provision of the Federal Constitution. But this court's interpretation of the Iowa Constitution is not dictated by the Supreme Court's precedents under the incorporation doctrine of the Federal Constitution.
II.
"Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." Berkey v. Third Ave. Ry. , 244 N.Y. 84, 155 N.E. 58, 61 (N.Y. 1926). This has been true of the floor-ceiling metaphor. "However useful that floor-ceiling metaphor may be, it obscures the larger truth that the level of protection of rights under the state constitutions can be the same as, higher than, or lower than that provided by the federal constitution." Malyon v. Pierce County , 131 Wash.2d 779, 935 P.2d 1272, 1281 n.30 (Wash. 1997) (en banc) (quoting Neil McCabe, The State and Federal Religion Clauses: Differences of Degree and Kind , 5 St. Thomas L. Rev. 49, 50 (1992) ). The failure of the metaphor has caused this court to undertake its interpretive function with a results-oriented approach that has created distortions in Iowa legal doctrine. Cf. Tucci , 859 S.W.2d at 32 n.34 (stating the recognition "that 'an independent state judiciary may interpret its fundamental law as affording less protection than our federal charter' ... will enhance the possibility of principled state constitutional development" (quoting id. at 13 (plurality opinion))).
As an example of how the metaphor changed doctrine, consider this court's treatment of the exclusionary rule. In Boyd v. United States and Weeks v. United States , the Supreme Court held that evidence obtained in violation of the Federal Constitution was inadmissible in a criminal proceeding. Weeks v. United States , 232 U.S. 383, 398, 34 S. Ct. 341, 346, 58 L.Ed. 652 (1914), overruled on other grounds by Mapp v. Ohio , 367 U.S. 643, 654-57, 81 S. Ct. 1684, 1691-92, 6 L.Ed.2d 1081 (1961) ; Boyd v. United States , 116 U.S. 616, 638, 6 S. Ct. 524, 536-37, 29 L.Ed. 746 (1886), abrogations recognized by Fisher v. United States , 425 U.S. 391, 407-09, 96 S. Ct. 1569, 1579-80, 48 L.Ed.2d 39 (1976). In State v. Tonn , 195 Iowa 94, 102-03, 104-07, 191 N.W. 530, 534, 535-36 (1923), abrogated by State v. Hagen , 258 Iowa 196, 203-05, 137 N.W.2d 895, 899-900 (1965), as recognized in State v. Taylor , 260 Iowa 634, 641-42, 144 N.W.2d 289, 293-94 (1966), this court considered Boyd and Weeks and declined to adopt the exclusionary rule as a remedy for the violation of the Iowa Constitution. Tonn remained good law for decades. See, e.g. , State ex rel. Hanrahan v. Miller , 250 Iowa 1369, 1375, 98 N.W.2d 859, 863 (1959) ; State v. Gillam , 230 Iowa 1287, 1289, 300 N.W. 567, 568 (1941) ; State v. Rowley , 216 Iowa 140, 145-46, 248 N.W. 340, 342-43 (1933) ;
*862 State v. Lambertti , 204 Iowa 670, 672, 215 N.W. 752, 753 (1927) ; State v. Wenks , 200 Iowa 669, 670, 202 N.W. 753, 753 (1925) ; McNamara v. Utterback , 200 N.W. 699, 700 (Iowa 1924) ; Lucia v. Utterback , 197 Iowa 1181, 1186, 198 N.W. 626, 628 (1924) ; Foley v. Utterback , 196 Iowa 956, 958, 195 N.W. 721, 722 (1923) (per curiam); Joyner v. Utterback , 196 Iowa 1040, 1044, 195 N.W. 594, 596 (1923).
In 2000, in Cline , this court concluded Mapp had abrogated Tonn. See 617 N.W.2d at 287 ("Iowa did not again have a state exclusionary rule until compelled to do so by the United States Supreme Court's decision in Mapp ."). The Cline court reasoned the authority to deviate from federal law was limited to providing greater protection than the Federal Constitution. See id. at 284-85.
Cline 's conclusion that Mapp required this court to adopt the exclusionary rule as a remedy for a violation of state constitutional law was incorrect. Cline 's conclusion is predicated on a misunderstanding of federal law. In Wolf v. Colorado , the Supreme Court held the principles underlying the Fourth Amendment were "enforceable against the States through the Due Process Clause." 338 U.S. 25, 27-28, 69 S. Ct. 1359, 1361, 93 L.Ed. 1782 (1949), overruled on other grounds by Mapp , 367 U.S. at 654-55, 81 S. Ct. at 1691. The Supreme Court specifically declined to require the states to adopt the exclusionary rule as the remedy for a violation of the Federal Due Process Clause. See id. at 33, 69 S. Ct. at 1364 ("We hold, therefore, that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure."). Subsequently, in Mapp , the Supreme Court overruled Wolf and held the required remedy for a violation of the Fourteenth Amendment right recognized in Wolf was the exclusion of unlawfully obtained evidence from a criminal proceeding.
It is surprising this court immediately moved away from Tonn after Mapp without explicitly overruling Tonn . A majority of the court in Mapp did not even support the conclusion that a violation of the Fourth Amendment, standing alone, required exclusion of the evidence. Justice Stewart expressed no view on the constitutional issue. Mapp , 367 U.S. at 672, 81 S. Ct. at 1701 (Stewart, J., concurring in the judgment) ("I express no view as to the merits of the constitutional issue which the Court today decides."). Justice Black concluded the Fourth Amendment, standing alone, compelled no right to the exclusion of evidence. Id. at 661-62, 81 S. Ct. at 1695 (Black, J., concurring) ("I am still not persuaded that the Fourth Amendment, standing alone, would be enough to bar the introduction into evidence against an accused of papers and effects seized from him in violation of its commands."). Instead, he found the remedy to be required due to the interaction of the Fourth and Fifth Amendments. Id. at 662, 81 S. Ct. at 1695 ; see also Collins , --- U.S. ----, 138 S. Ct. at 1677-80, 1677 nn.2-3 (discussing Mapp ). Justice Harlan, joined by Justices Frankfurter and Whitaker, dissented. Mapp , 367 U.S. at 678-80, 81 S. Ct. at 1704-05 (Harlan, J., dissenting) ("I would not impose upon the States this federal exclusionary remedy. The reasons given by the majority for now suddenly turning its back on Wolf seem to me notably unconvincing.").
Regardless of whether Mapp was rightly or wrongly decided, the important point of the discussion is this: Wolf and Mapp both involved the resolution of claims arising under the Fourteenth Amendment. Neither case compelled any state court to reach a particular resolution-whether less *863 protective, more protective, or as protective-of any legal claim arising under its own state constitution. Cline was thus incorrect in stating Mapp abrogated Tonn and precluded this court from interpreting the state constitution to provide less protection than the Federal Constitution. While there may be reasons why this court would want to adopt the exclusionary rule for violations of the Iowa Constitution, many of which are discussed in Cline , it was incorrect to say Mapp compelled this court to do so.
III.
This special concurrence is not intended as a call to arms to find less or more protection of individual rights under the Iowa Constitution as compared to the United States Constitution. Instead, it is a call to determine the meaning of the Iowa Constitution without an interpretive predisposition that the Iowa Constitution must, as a matter of law, be interpreted to provide only greater protection than the United States Constitution. See Linde, E Pluribus , 18 Ga. L. Rev. at 179 ; see also Gaskins , 866 N.W.2d at 21 n.7 (Iowa 2015) (Appel, J., concurring specially) ("This case makes the powerful point that independent state constitutional law is neither conservative nor liberal. It simply preserves what the United States Supreme Court has referred to as our 'free and unfettered' authority in interpreting our state constitution." (quoting Nat'l Tea Co. , 309 U.S. at 557, 60 S. Ct. at 679 )); King v. State , 797 N.W.2d 565, 571 (Iowa 2011) ("[W]e reserve the right to apply the principles differently under the state constitution compared to its federal counterpart."). In this particular case, I concur with my colleagues that neither the United States Constitution nor the Iowa Constitution provides Brown with any relief and that her conviction should be affirmed.

We also note a textual difference for order of appearance; the Iowa Constitution reverses the order of "searches and seizures."

In State v. Harrison , 846 N.W.2d 362 (Iowa 2014), we quoted this language from Kreps with approval. Id. at 366. However, in that case we also said, "The parties did not raise on appeal the issue of whether a pretextual traffic stop is valid. We therefore do not reach that issue." Id. at 364 n.1.

See, e.g. , State v. Ossana , 199 Ariz. 459, 18 P.3d 1258, 1260 (Ct. App. 2001) (relying on Whren for a Fourth Amendment claim and holding "[t]he officers had the right to stop appellant's car if they reasonably believed he had committed a traffic violation"); State v. Mancia-Sandoval , 2010 Ark. 134, 361 S.W.3d 835, 839-40 (2010) ("As previously noted, a pretextual stop is not impermissible under either the federal or Arkansas Constitution and, thus, does not invalidate an otherwise lawful stop of the vehicle."); People v. Miranda , 17 Cal.App.4th 917, 21 Cal. Rptr. 2d 785, 789 (1993) (determining under the Fourth Amendment, "the subjective motivation of an arresting officer is irrelevant in determining the propriety of a traffic stop"); People v. Ingram , 984 P.2d 597, 603 (Colo. 1999) (en banc) (concluding under the Fourth Amendment, "[a] reviewing court must base its analysis of whether reasonable suspicion exists on an objective analysis and not upon the subjective intent of the arresting officer"); Karamychev v. District of Columbia , 772 A.2d 806, 813 n.9 (D.C. 2001) (applying Whren , "if [the officer] had an adequate objective basis to stop (and then arrest) Karamychev, his subjective motivation was legally irrelevant"); Holland v. State , 696 So. 2d 757, 760 (Fla. 1997) (applying the objective standard established in Whren in state constitutional analysis and noting "the Whren Court made it clear that subjective viewpoints no longer factor into the analysis"); State v. Bolosan , 890 P.2d 673, 681 (Haw. 1995) ("This court has also disapproved of analyses of officers' subjective bases for conducting investigatory stops in favor of an objective standard, and we see no reason to depart from that position." (Citation omitted.)); State v. Myers , 118 Idaho 608, 798 P.2d 453, 455 (Ct. App. 1990) (concluding for a Fourth Amendment claim, that "any underlying motive of [the officer] in stopping Myers' vehicle as a pretext to search for drugs was irrelevant because the stop was justified by an objectively reasonable basis"); People v. Rucker , 294 Ill.App.3d 218, 228 Ill.Dec. 782, 689 N.E.2d 1203, 1208 (1998) ("Regardless of [the officer's] subjective intention for stopping the vehicle, the key question is whether he had a reasonable, articulable suspicion of criminal activity such that he could lawfully stop the vehicle."); Mitchell v. State , 745 N.E.2d 775, 787 (Ind. 2001) (holding under the Indiana Constitution, there is "nothing unreasonable in permitting an officer, who may have knowledge or suspicion of unrelated criminal activity by the motorist, to nevertheless respond to an observed traffic violation"); State v. Jones , 300 Kan. 630, 333 P.3d 886, 893 (2014) (adopting the Whren objective standard); Commonwealth v. Bucalo , 422 S.W.3d 253, 258 (Ky. 2013) ("It has long been considered reasonable for an officer to conduct a traffic stop if he or she has probable cause to believe that a traffic violation has occurred."); State v. Waters , 780 So. 2d 1053, 1056 (La. 2001) (per curiam) (applying Whren and stating, that "[t]he standard [for assessing the reasonableness of a traffic stop] is a purely objective one that does not take into account the subjective beliefs or expectations of the detaining officer"); State v. Sasso , 143 A.3d 124, 128 (Me. 2016) ("The Supreme Court holding announced in Whren is consistent with Maine's standard for evaluating whether a traffic stop passes constitutional muster."); Wilkes v. State , 364 Md. 554, 774 A.2d 420, 430-31 (2001) (referring to Whren in determining the constitutionality of a traffic stop under the Fourth Amendment); Commonwealth v. Buckley , 478 Mass. 861, 90 N.E.3d 767, 778 (2018) ("Outside of the racial profiling context-as this case is-the reasonableness of a traffic stop does not depend upon the particular motivations underlying the stop.... [L]egal justification alone, such as an observed traffic violation, is sufficient."); People v. Kazmierczak , 461 Mich. 411, 605 N.W.2d 667, 672 n.8 (2000) (relying on Whren in determining "[t]he traffic stop here was permissible because [the officer] observed a traffic violation"); State v. George , 557 N.W.2d 575, 578 (Minn. 1997) (en banc) ("Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle."); Floyd v. City of Crystal Springs , 749 So. 2d 110, 114-15 (Miss. 1999) (en banc) (referring to Whren after comparing the "almost identical language" of the Fourth Amendment to Mississippi's search and seizure provision); State v. Brink , 218 S.W.3d 440, 445 (Mo. Ct. App. 2006) ("Whether or not a traffic stop is reasonable and therefore lawful does not depend on the investigating officer's motive."); State v. Farabee , 302 Mont. 29, 22 P.3d 175, 180-81 (2000) (declining to adopt the "would have" standard rejected in Whren to evaluate pretextual stops under the Montana Constitution, concluding "[that the court has] never held, however, that an otherwise objectively justifiable traffic stop is nonetheless unlawful because a law enforcement officer used the stop to investigate a hunch about other criminal activity"); State v. Bartholomew , 258 Neb. 174, 602 N.W.2d 510, 514 (1999) ("If an officer has probable cause to stop a violator, the stop is objectively reasonable, and any ulterior motivation on the officer's part is irrelevant."); Gama v. State , 112 Nev. 833, 920 P.2d 1010, 1013 (1996) (per curiam) (holding an officer's subjective motivation is irrelevant in analyzing the validity of a traffic stop "because we now conclude that the Nevada Constitution's search and seizure clause provides no greater protection than that afforded under its federal analogue, at least in the area of pretextual traffic stops"); State v. McBreairty , 142 N.H. 12, 697 A.2d 495, 497 (1997) ("The ultimate test of the propriety of an investigatory stop under part I, article 19 is whether, viewing the circumstances objectively, an officer had a specific and articulable basis for concluding that an individual had committed, was committing, or was about to commit a crime."); State v. Bacome , 228 N.J. 94, 154 A.3d 1253, 1258 (2017) ("The objective reasonableness of police officers' actions-not their subjective intentions-is the central focus of federal and New Jersey search-and-seizure jurisprudence."); People v. Robinson , 97 N.Y.2d 341, 741 N.Y.S.2d 147, 767 N.E.2d 638, 642 (2001) ("In making that determination of probable cause [for a traffic stop], neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant."); State v. McClendon , 350 N.C. 630, 517 S.E.2d 128, 635 (1999) (rejecting defendant's request to depart from the objective standard established in Whren under the North Carolina Constitution because "in general, police action related to probable cause should be judged in objective terms, not subjective terms"); State v. Oliver , 724 N.W.2d 114, 116 (N.D. 2006) (relying on Whren to determine "that [a] police officer's subjective intentions in making a stop are not important as long as a traffic violation has occurred"); City of Dayton v. Erickson , 76 Ohio St.3d 3, 665 N.E.2d 1091, 1097-98 (1996) ("[W]here an officer has an articulable reasonable suspicion or probable cause to stop a motorist for ... a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question."); Dufries v. State , 133 P.3d 887, 889 (Okla. Crim. App. 2006) ("[W]here an officer has probable cause to believe a traffic violation has occurred, his subjective motivation for stopping the vehicle is irrelevant to the legality of the stop."); State v. Carter , 287 Or. 479, 600 P.2d 873, 875 (1979) (en banc) ("The officer's motives for an otherwise justifiable traffic stop are, as we held in [State v. ] Tucker , [286 Or. 485, 595 P.2d 1364 (1979) ] not relevant to the question of its validity."); Commonwealth v. Chase , 599 Pa. 80, 960 A.2d 108, 120-21 (2008) (concluding that a state statute allowing police officers to initiate traffic stops based on reasonable suspicion of vehicle code violations did not offend the state constitution's search and seizure provision); State v. Bjerke , 697 A.2d 1069, 1073 (R.I. 1997) (declining to depart from Whren under the Rhode Island Constitution because it would be "unprincipled and unwarranted"); State v. Vinson , 400 S.C. 347, 734 S.E.2d 182, 184 (Ct. App. 2012) (referring to Whren and indicating an officer's subjective motivations play no role in search and seizure analysis); State v. Vineyard , 958 S.W.2d 730, 736 (Tenn. 1997) ("[W]e conclude that probable cause justifies a traffic stop under Article I, Section 7 of the Tennessee Constitution without regard to the subjective motivations of police officers."); Crittenden v. State , 899 S.W.2d 668, 673 (Tex. Crim. App. 1995) (en banc) ("Having adopted the objective approach under the Fourth Amendment, not because of binding precedent, but because it 'makes more sense' than the alternatives, we can hardly justify concluding otherwise for purposes of Article I, § 9."); State v. Lopez , 873 P.2d 1127, 1140 (Utah 1994) (holding an officer's subjective motivation for making a traffic stop is irrelevant so long as the traffic stop is based upon probable cause or reasonable suspicion); State v. Tetreault , 206 Vt. 366, 181 A.3d 505, 511 (2017) (applying Whren and stating that "[a] traffic stop constitutes a seizure under either [United States or Vermont search and seizure provision] and must be supported by reasonable suspicion that a motor vehicle violation or other crime is taking place"); Harris v. Commonwealth , 276 Va. 689, 668 S.E.2d 141, 146 (2008) (indicating for a claim pursuant to the Fourth Amendment, that "the Court's review of whether there was reasonable suspicion involves application of an objective rather than a subjective standard"); Muscatell v. Cline , 196 W.Va. 588, 474 S.E.2d 518, 527 (1996) ("[I]f the trooper did indeed observe such a misdemeanor violation of the 'rules of the road', his stop would clearly be justified in any event."); State v. Rutzinski , 241 Wis.2d 729, 623 N.W.2d 516, 520-21 (2001) (relying on the objective standard established in Whren under the Wisconsin Constitution).

See State v. Heath , 929 A.2d 390, 405-06 (Del. Super. Ct. 2006) ; State v. Ochoa , 146 N.M. 32, 206 P.3d 143, 146 (Ct. App. 2008) ; State v. Ladson , 138 Wash.2d 343, 979 P.2d 833, 836 (1999) (en banc).

Heath , 929 A.2d at 402-03 ; Ochoa , 206 P.3d at 155-57.

A peace officer may also stop a vehicle on less than probable cause for the investigation of unusual behavior that reasonably causes the peace officer to believe criminal activity is afoot. Tague , 676 N.W.2d at 204 ; see also Terry v. Ohio , 392 U.S. 1, 30, 88 S. Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).