**COMMONWEALTH of Kentucky, Appellant.**

v.

**Asia BUCALO, Appellee.**

No. 2012–SC–000123–DG.

Supreme Court of Kentucky.

Dec. 19, 2013.

Rehearing Denied March 20, 2014.

Jack Conway, Attorney General, Todd Dryden Ferguson, Assistant Attorney General, Counsel for Appellant.

Erin Hoffman, Yang Assistant Public Advocate, Counsel for Appellee.

Opinion of the Court by Justice, CUNNINGHAM.

On April 2, 2009, Appellant Asia Bucalo, along with her six-year-old son, checked into the Comfort Suites Hotel in Elizabethtown, Kentucky. Also, a man by the name of Nicholas Duke and another unidentified male accompanied Bucalo and her son to the hotel. Bucalo explained to hotel personnel that she was in need of a place to stay while pending the closing of her new home. The group of individuals stayed in one hotel room for fifteen days. During their stay, the group paid their bill each day in cash and declined maid service. Having become skeptical of the individuals, hotel personnel terminated their stay and notified law enforcement officials of their suspicious behavior.

In response, Detective Gregory and Detective Green of the Kentucky State Police arrived at the Comfort Suites Hotel on April 16, 2009, and began surveillance of the parking lot. Detective Green observed the parties loading their belongings into three separate vehicles. The vehicles were registered to local individuals, including Bucalo, all of whom had different last names. Neither Detective Gregory nor Detective Green noticed anything illegal being packed into any of the vehicles. Shortly after 12:15 p.m., a white Dodge truck driven by Duke pulled out of the hotel parking lot, followed by a green Honda Accord driven by Bucalo.

Detective Gregory then opted to inspect the hotel room the parties had occupied and ordered other law enforcement agents to follow the two vehicles. Ultimately, nothing illegal was found in the hotel room. Meanwhile, Sergeant Kelly and Officer Bracket of the Elizabethtown Police Department spotted the two vehicles. After both vehicles ran the same red light, Officer Bracket pursued and pulled over Duke, while Sergeant Kelly pursued and pulled over Bucalo. Both traffic stops occurred simultaneously and in close proximity to each other. The time was approximately 12:40 p.m.

At the inception of Bucalo's traffic stop, she told Sergeant Kelly that she was in a rush because her son needed to use the restroom. Bucalo also explained that she was moving from one hotel to another. Bucalo requested to take her son to the bathroom several times during the stop, which Sergeant Kelly denied. Approximately five to seven minutes after Bucalo's stop, Officer Young, also of the Elizabethtown Police Department, arrived on the scene.

About the same time, Officer Bracket radioed Sergeant Kelly and Detective Gregory and notified them that Duke had consented to a search of his truck, which revealed narcotic residue located in a pipe. In addition, Officer Bracket explained to Sergeant Kelly and Detective Gregory that the drug paraphernalia was related to Bucalo since Duke said he was moving her belongings to another hotel. Sergeant Kelly then requested consent from Bucalo to search her vehicle. She declined consent.

At some point shortly after 1:00 p.m., Detective Gregory arrived at the scene of Bucalo's stop. Detective Gregory testified that he called for a canine unit to sniff Bucalo's vehicle. This call was placed either while Detective Gregory was en route to Bucalo's stop, or as soon as he arrived at the scene. When Detective Gregory arrived, Sergeant Kelly left the scene, relying on Officer Young to write the traffic citation.

Trooper Payne of the Kentucky State Police K–9 Unit and his drug detecting dog Barry arrived at the scene shortly after 1:00 p.m. After adjusting to his new surroundings, Barry performed an exterior sniff of Bucalo's vehicle, which failed to result in an alert. Trooper Payne then

proceeded to conduct a "detail out," whereby he pointed to specific spots on the vehicle's exterior and ordered Barry to sniff. It was during a point to the driver's side door that Barry made an alert.

A search of Bucalo's vehicle was then conducted and ecstasy, marijuana, mushrooms, methamphetamine, and chemicals or equipment used in the manufacturing of methamphetamine were discovered. Bucalo was taken into custody at 2:25 p.m. From the beginning of the stop at 12:40 p.m. to its conclusion at 2:25 p.m., the traffic stop lasted approximately one hour and forty-five minutes.

On June 15, 2009, Bucalo moved to suppress the evidence obtained from the search of her vehicle. The trial court held a suppression hearing on August 18, 2009, during which Detective Gregory, Sergeant Kelly, and Trooper Payne testified. The trial court ruled that the dog sniff occurred within a reasonable time or extension of time needed to conduct the traffic stop. Furthermore, the court found that any prolonging of the stop was justified by a reasonable and articulable suspicion that criminal activity was afoot. Consequently, the trial court denied Bucalo's motion.

On November 6, 2009, Bucalo entered a conditional guilty plea in the Hardin Circuit Court to one count of manufacturing methamphetamine, one count of first-degree trafficking in a controlled substance, two counts of first-degree possession of a controlled substance, one count of possession of drug paraphernalia, and one count of possession of marijuana. Bucalo received a sentence of twelve years, with seven years to serve and five years probated, in addition to a $1,000 fine.

Within Bucalo's guilty plea, she reserved the right to appeal the Hardin Circuit Court's denial of her motion to suppress evidence seized during the investigatory stop. It is from this denial that Bucalo appealed to the Court of Appeals, which reversed the trial court's ruling.

The Court of Appeals found that Bucalo was detained for an unreasonably prolonged amount of time. Moreover, the Court of Appeals determined that the officers lacked reasonable suspicion to extend the duration of the stop beyond the time needed to complete a citation for a traffic violation. This Court granted discretionary review.

■ In reviewing a trial court's ruling on a motion to suppress, we employ a two-step process. *E.g., Adcock v. Commonwealth,* 967 S.W.2d 6, 8 (Ky.1998) (citing *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). First, we examine whether the trial court's findings of fact are supported by substantial evidence. *Id.* (citing RCr 9.78). If the trial court's factual findings are not clearly erroneous, then we conduct a de novo review of its applicability of the law to the facts. *Id.*

Before we begin our analysis, it is incumbent upon us to underscore the difficulty we face in reviewing this case due to the limited record that has been provided. The chronology of events has especially been difficult to piece together. We encourage counsel and law enforcement agents to do better. Fortunately, the trial court made sufficient factual findings by its order dated August 27, 2009. We find that the trial court's findings are not clearly erroneous. Furthermore, neither party contests the trial court's findings of fact. Therefore, we turn to the trial court's application of the law to the facts.

### Traffic Stop

■ The Fourth Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment and Section 10 of the Kentucky Constitution, protects citizens from unreasonable

searches and seizures. A traffic stop is considered a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Therefore, a traffic stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. U.S.,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). It has long been considered reasonable for an officer to conduct a traffic stop if he or she has probable cause to believe that a traffic violation has occurred. *Wilson v. Commonwealth,* 37 S.W.3d 745 (Ky.2001).

Bucalo does not contend that the initial stop of her vehicle was unlawful. Indeed, there is no doubt that Sergeant Kelly had probable cause to warrant the stop of Bucalo's vehicle. He witnessed her commit a traffic violation. As long as an officer "has probable cause to believe a civil traffic violation has occurred, [he] may stop [the] vehicle regardless of his or her subjective motivation in doing so." *Wilson,* 37 S.W.3d at 749.

### Length of Detention

A lawful stop may nevertheless encroach on an individual's Fourth Amendment rights "if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). For these reasons, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Generally, if an officer unreasonably prolongs the investigatory stop in order to facilitate a dog sniff, any resulting seizure will be deemed unconstitutional. *See Epps v. Commonwealth,* 295 S.W.3d 807 (Ky.2009). We must also note that the Fourth

Amendment is not implicated simply because a drug-detecting dog conducts a sniff of the exterior of a vehicle during a lawful traffic stop. *Id.* at 810. It is well-settled that a dog sniff is an acceptable investigative device which may be utilized during a lawful investigative stop. *See Caballes,* 543 U.S. at 409, 125 S.Ct. 834.

The trial court determined that the dog sniff occurred within a reasonable amount of time needed to effectuate the purpose of the traffic stop. In addition, the trial court believed any extension thereof was due to Bucalo's numerous requests to allow her child to use the restroom. With this conclusion, we disagree.

As explained, Sergeant Kelly initially had probable cause to detain Bucalo for the limited purpose of issuing a traffic citation. Therefore, we must determine if the period of detention lasted longer than that which is necessary to issue a basic traffic citation. We find *Epps v. Commonwealth* controlling. 295 S.W.3d 807. In *Epps,* this Court found an entire detention time of ninety minutes from the initial stop to the defendant's arrest to be unconstitutional. Specifically, this Court stated the following: "[F]ifteen minutes before the narcotics-detection dog arrived, thirty to forty more minutes for the dog to search the car, one hour before the driver was given a citation, and [ninety] minutes of total detention before the Appellant-passenger was arrested[,] exceeded that allowed for a mere traffic offense." *Id.* at 813.

During the suppression hearing, Detective Gregory testified that, at the earliest, the canine unit arrived shortly after 1:00 p.m.—twenty minutes after the traffic stop. It then took the dog additional time to acclimate himself to the scene and to conduct two sniffs, an exterior sniff and a detailed sniff. Once again, due to a poor record, we have no evidence of the amount

of time it took for the canine to conduct the sniff other than Officer Payne's broad testimony that it took "an hour or less." Bucalo was further detained until the completion of the arrest citation at 2:25 p.m. The total time of Bucalo's detention from the initial stop to her arrest was 105 minutes. Pursuant to *Epps*, Bucalo's stop was unduly prolonged beyond the appropriate time necessary to complete the purpose of the stop.

We also disagree with the trial court's finding that the stop was reasonably extended because Bucalo requested that her son be allowed to use the restroom on several occasions. Like the Court of Appeals, we fail to understand how several simple requests to use the restroom would extend the stop more than a few minutes. While it is true that Bucalo was eventually allowed to take her son to the restroom in the adjacent hotel, we do not believe this bathroom trip would have extended the stop in any significant way.

### Reasonable and Articulable Suspicion

■■■■ Having concluded that Bucalo was detained beyond the time necessary for the purpose of the traffic stop to be accomplished, any subsequent detention is only constitutionally permissible if the officers had probable cause or reasonable suspicion to warrant prolonging the stop. *See Commonwealth v. Marshall,* 319 S.W.3d 352, 357 (Ky.2010) (whether a search or seizure "trample[s] the Fourth Amendment.... questions the existence of probable cause or reasonable suspicion, whatever the situation necessitates."). While the trial court found that Bucalo's detention was not unduly prolonged, it nevertheless opined that any further detainment was warranted because Detective Gregory had reasonable and articulable suspicion that criminal activity was afoot. We agree with the trial court.

First, we must note that some members of this Court believe that, upon learning of contraband in Duke's car, the level of evidence supported a finding of probable cause to search Bucalo's vehicle. Nonetheless, we continue with the majority's conclusion that there was ample evidence to support a finding of reasonable suspicion.

■■■■ The U.S. Supreme Court has stated that "a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting in part *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *see also Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Accordingly, once the purpose of the traffic stop is accomplished, the additional detention of a suspect is no longer justified by probable cause. The traffic stop essentially becomes a *Terry* stop, which requires law enforcement agents to possess a reasonable and articulable suspicion that criminal activity is afoot. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868.

The U.S. Supreme Court expounded on the notion of reasonable and articulable suspicion as follows:

Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*U.S. v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

With these standards in mind, we turn to the following facts that aided the trial court in concluding that Detective Gregory had reasonable and articulable suspicion: (1) the information from hotel management that [Bucalo] was a "local" individual staying at the hotel for a period of 15 days paying cash and refusing maid service; (2) [Bucalo] said she was traveling to another hotel at the same interchange; and (3) that methamphetamine paraphernalia was located in [Duke's] vehicle that was observed being loaded at the hotel which [Bucalo] just left and the information that the Co–Defendant said he was helping [Bucalo] move from one hotel to another.

Bucalo maintains that the above-mentioned facts did not give rise to reasonable suspicion that she was involved in any criminal activity. While each fact individually may not be suspicious, we believe the totality of the circumstances lends credence to the trial court's determination. Certainly, the behavior of Bucalo and her confederates raised the suspicion of the hotel manager. Assuredly, there is nothing illegal about daily paying cash for a hotel room, nor declining room service, even for fifteen days. But it was unusual and suspicious enough for a vigilant innkeeper to call the police.

As Detective Gregory testified, the aforementioned facts led him to believe that the parties were manufacturing methamphetamine in their hotel room. Detective Gregory's suspicions were more than a mere hunch and were based on his training and experience that methamphetamine is often produced in hotels. In fact, as Detective Gregory testified, law enforcement agents conduct seminars for hotels across the Commonwealth in order to educate hotel employees on specific identifiers and behaviors that are indicative of metham-

phetamine production. Furthermore, all three cars were loaded at the same time, and two of the vehicles left the hotel simultaneously and ran the same stop light. Most telling, the vehicle hauling Bucalo's personal belongings contained drug paraphernalia. Therefore, we agree with the trial court that Detective Gregory had reasonable and articulable suspicion that Bucalo was engaged in criminal activity.

### Length of Terry Stop

Even if an officer has reasonable and articulable suspicion, there are still limits on the duration of the detention. The detention cannot extend beyond what is reasonable and necessary. *See U.S. v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The test is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly[.]" *Id.* We believe Detective Gregory was diligent in requesting a canine unit. Once again, we note the lack of specifics in the record. However, we do know that Detective Gregory requested the canine unit while he was en route to the scene or shortly after arriving at the scene. In regards to the amount of time it took for the canine unit to arrive, Officer Payne testified that once he received the call from Detective Gregory he responded within ten minutes. We do not believe this time lapse was unreasonable.

### Conclusion

In summary, Bucalo was detained beyond the time necessary to effectuate the purpose of the traffic stop. However, the prolonging of Bucalo's detention was justified by at least a reasonable and articulable suspicion that she was engaged in criminal activity. For the foregoing reasons, we reverse the opinion of the Court of Appeals and hereby affirm the Hardin

Circuit Court's order denying Bucalo's motion to suppress.

ABRAMSON, KELLER, SCOTT, and VENTERS, JJ., concur. NOBLE, J., dissents by separate opinion in which MINTON, C.J., joins.

NOBLE, J., Dissenting.

I part company with the majority on the conclusion that the detention period here did not extend beyond that which was reasonable and necessary. As the majority notes, "the test is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions *quickly*." *Ante* at 260 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), emphasis added, brackets omitted). There was nothing quick about the dog sniff in this case.

While I agree that the facts of this case certainly warranted a traffic stop, the length of the stop and the way the drug dog was used was certainly problematic. The stop occurred at approximately 12:40 p.m. But the drug dog did not arrive until around 1:15 p.m. No ticket was issued until 2:25 p.m., 105 minutes after the initial stop, when drug arrests were also made. The time was too long and the search was therefore unreasonable.

First, there was no reason to extend the stop until the drug dog arrived. The majority holds that the drug pipe with narcotic residue found in the second vehicle being driven by Dukes, along with the other circumstances, sufficed to give the police a reasonable suspicion to extend the stop. While Dukes said he was helping to move Bucalo's belongings, he did not say the pipe was hers, nor did the officers testify that the pipe was found in or around Bucalo's belongings. One police officer merely made the conclusion that the pipe was "related to her" because Dukes said he was moving her property. A drug pipe is a personal use piece of paraphernalia which was found in Dukes's truck. Presumably, Bucalo's goods were in the *bed* of the truck. At any rate, we don't know from the record that the pipe was anywhere near Bucalo's belongings. In short, the drug pipe was not reasonably related to anything the police knew about Bucalo at that point.

But even assuming the police properly waited for the drug dog, the stop was continued longer than it should have been. When the dog arrived, he was given time to adjust to his surroundings by relieving himself and acclimating to the area. Then, the dog was taken around the vehicle to perform an exterior sniff. Significantly, the dog did not alert at any place on the vehicle. At that point, there was certainly no further articulable suspicion to continue detaining Bucalo.

Nevertheless, the stop continued. Following the dog's failure to alert, Trooper Payne, the K9 officer, began "detailing" the vehicle. Apparently, detailing involves the officer taking the dog around the vehicle and pointing to certain areas and then presenting the dog to those areas. The risk of a dog alerting where an officer points is clear. And the dog did finally alert to a place where the officer pointed. While drugs actually were found there, this does not justify the repeated attempts to get the dog to alert when he did not do so on the ordinary drug sniff of the vehicle, nor the undue delay in presenting the dog to the vehicle over and over. Again, as the United States Supreme Court stated in *Sharpe*, when there is merely suspicion, the search should be *quick*. This was not a quick search.

Nor should this Court fall for the old "end justifies the means" mode of thinking. The question before us is not whether the dog did eventually find drugs, but whether it took too long to do so. This Court ad-

dressed a similar situation in *Epps v. Commonwealth,* 295 S.W.3d 807 (Ky.2009). The defendant in *Epps* was stopped for a traffic violation, and detained so that a K9 unit could be called. The entire stop took about ninety minutes, *fifteen minutes less* than the stop in this case. In *Epps,* it took about fifteen minutes or so for the drug dog to arrive, while here it took approximately thirty-five minutes. In that case, it took about forty minutes to complete the drug sniff, and the ticket was not given to the driver until nearly an hour later. Here, we don't know the actual length of the repeated sniffs until the dog alerted, but we do know it took about another 70 minutes before an arrest was made. We held in *Epps* that the ninety-minute time frame was too long for a mere traffic stop. It simply makes no sense that 105 minutes would not be too long for the stop, unless there was another legitimate reason for the delay.

But as the Court of Appeals correctly noted, there was no other reason to prolong the stop of Bucalo's vehicle. The mere presence of a drug pipe with narcotic residue, found in *another person's vehicle,* does not give police an articulable suspicion that *Bucalo* had drugs in her vehicle. That Dukes explained he ran the red light in order to keep up with Bucalo's because he was moving her belongings does not identify the pipe as hers.

And clearly, the officers viewed this as a mere traffic stop, because if they had believed they had probable cause, they could have searched the vehicle without a warrant. *See Arizona v. Gant,* 556 U.S. 332, 347, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). They would not have needed to call for the drug dog.

The Court of Appeals was correct in its analysis of this case. If *Epps* is the law of this Commonwealth, then the majority opinion cannot be consistent. There was no sufficient legal basis to search Bucalo's

vehicle absent the dog alert, and the stop was prolonged unduly until the dog could be gotten to alert. The Court of Appeals vacated the defendant's conditional guilty plea and remanded the case for further consistent proceedings. I would therefore affirm the Court of Appeals.

MINTON, C.J., joins.