MODIFIED DECEMBER 16, 2021
RENDERED: SEPTEMBER 30, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0058-DG

COMMONWEALTH OF KENTUCKY                                    APPELLANT


                     ON REVIEW FROM COURT OF APPEALS
V.                            NO. 2019-CA-0140
                     FAYETTE CIRCUIT COURT NO. 17-CR-00668


IKIA ANDERSON CLAYBORNE                                      APPELLEE


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

## I.     BACKGROUND

Just before midnight on April 21, 2017, Officer Ryan Nichols of the Lexington Community Law Enforcement Action Response Unit (CLEAR Unit)[1] was patrolling the East side of Lexington. While out, Officer Nichols saw an idling vehicle pulled to the side of the road. A pedestrian was talking to its two occupants by the driver's side window. When the pedestrian saw the police vehicle, he walked away from the car. The car began driving again and turned onto Third Street. Officer Nichols followed the car and ran its license plate. The search on the vehicle's plate uncovered a record for a suspended license and a

---

[1] The CLEAR Unit specializes in high-visibility, proactive policing.

"verify for proof of insurance" associated with the vehicle's owner. With this information, Officer Nichols turned on his emergency lights and initiated a traffic stop on the vehicle at Third Street and Broadway.

Officer Nichols approached the vehicle and asked the driver, Robert Spillman (Spillman), for his license and registration. He asked the passenger of the vehicle, Ikia Clayborne (Clayborne), for identifying information as well. After running both parties' information for warrants and jail records, Officer Nichols found that Spillman had a suspended license, and that both Spillman and Clayborne had former narcotics charges. Officer Nichols testified that upon discovering their former charges, he requested a K-9 unit to come and search the scene.

By the time the K-9 Unit arrived ten minutes later, Officer Nichols had only completed up to the narrative portion of Spillman's citation. However, he abandoned writing the citation, exited his vehicle, informed the K-9 Unit of what led him to call it to the scene, asked Spillman and Clayborne to exit the vehicle, and explained the search procedure to Spillman and Clayborne as they stood by his car. Then, he waited with Spillman and Clayborne while the K-9 Unit sniff-searched the vehicle. Officer Nichols attests that Spillman and Clayborne were cooperative for the duration of the stop.

Approximately two minutes into the dog sniff, the dog alerted. Officer Nichols and Officer Harris, another officer serving with Nichols that night on the CLEAR Unit, then searched the vehicle. In that search, Officer Harris found

a baggie containing cocaine on the ground outside of the front passenger-side door. It is not clear how it came to be on the ground.

After Officer Harris seized the cocaine, Officer Nichols completed Spillman's citation, wrote out a citation for Clayborne, and arrested Clayborne. Clayborne was charged with first-degree possession of cocaine. He subsequently pleaded not guilty.

On August 1, 2017, Clayborne filed a motion to suppress the evidence of cocaine, claiming that he was illegally detained at the scene. At a hearing on the motion, Clayborne also argued that the police did not have reasonable, articulable suspicion to call the dog. The Commonwealth, on the other hand, argued both that the officers had reasonable, articulable suspicion for the dog sniff and that Clayborne was not detained any longer than was necessary for the purpose of the stop. Despite the parties' arguments, the trial court focused its analysis on the validity of the stop itself. It noted that Officer Nichols was still writing the citation when the K-9 Unit arrived but did not clearly apply this fact in its analysis. The trial court determined that it was a valid stop, and that because the initial stop was valid, the evidence should not be suppressed. The trial court denied the motion from the bench, and subsequently issued a written order completely devoid of any additional findings of fact or conclusions of law.

On May 9, 2018, six months before Clayborne's trial, Clayborne filed a motion to reconsider the suppression issue. In that motion, Clayborne cited two cases decided by the Kentucky Supreme Court since his original motion to

suppress: *Moberly v. Commonwealth,* 551 S.W.3d 26 (Ky. 2018) and *Commonwealth v. Smith*, 542 S.W.3d 276 (Ky. 2018). Clayborne argued in the motion that these cases required that the evidence seized as a result of the K-9 search be suppressed. At a subsequent hearing, the Commonwealth argued that "the appropriate remedy" would be to preserve the suppression issue for appeal, but requested time to respond to the motion. The trial court granted the Commonwealth's request for time to respond.

In its brief, the Commonwealth argued that the cases cited by Clayborne were distinguishable because Officer Nichols's stop was not extended to accomplish the dog sniff. Clayborne's response reiterated that the purpose of the stop was abandoned without introduction of new reasonable and articulable suspicion of criminal activity, and therefore "weaken[ed]" Clayborne's Fourth Amendment protections. One week after these briefs were submitted, the trial court issued a written order denying the motion to reconsider without making any findings of fact or conclusions of law to justify the denial. Clayborne was later convicted at trial and sentenced to one year in prison, probated for one year.

Clayborne appeals the trial court's ruling on his motion to suppress. He argues that it was error for the court to deny his motion in light of the precedent of the Kentucky Supreme Court and United States Supreme Court, asserting that no reasonable articulable suspicion existed to permit the K-9 Unit search and that the search unconstitutionally extended the traffic stop in violation of his Fourth Amendment rights.

## II.    STANDARD OF REVIEW

"When reviewing a trial court's ruling on a motion to suppress, the findings of fact are reviewed under a clearly erroneous standard, and the conclusions of law are reviewed de novo." *Moberly*, 551 S.W.3d at 29 (citing *Davis v. Commonwealth*, 484 S.W.3d 288, 290 (Ky. 2016)). For motions to suppress the fruits of a warrantless search, "[t]he Commonwealth bears the burden of establishing the constitutional validity" of that search. *Commonwealth v. Lane*, 553 S.W.3d 203, 206 (Ky. 2018). The Rules of Criminal Procedure (RCr) govern motions to suppress evidence and require the trial court to "state its essential findings on the record." RCr 8.27(5), 8.20(2); *see also* CR 52.01. For motions to suppress, these findings must be "supported by substantial evidence" or they will be held "clearly erroneous" on review. *Turley v. Commonwealth*, 399 S.W.3d 412, 418, 420 (Ky. 2013) (citing *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)). "Substantial evidence" means "evidence that when taken alone or in light of all evidence, has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* at 420 (citations and quotations omitted).

We have little to go on in our review of the facts. The trial court made no written factual findings at, or after, the motion to suppress hearing, and no findings at all (either written or oral) regarding the motion to reconsider. The limited factual findings stated by the trial court at the suppression hearing, as best as we can conclude from the trial court's discussion before denying the motion, are:

5

1. Officer Nichols, Spillman, and Clayborne were "very pleasant, very cordial."

2. Officer Nichols "found a suspended license . . . he got that information," and therefore "had a valid reason to [initially] stop this vehicle."

3. Officer Nichols "believed he had a basis for calling a K-9."

4. Officer Nichols "didn't even finish [the citation], didn't even get to the narrative part."

In an apparent contradiction, the trial court also stated on the record that Officer Nichols was "very candid about, after seeing what he saw on Ohio Street, thinking there may have been something there," even though the trial court *also* subsequently stated that Officer Nichols "didn't conclusively state" suspicions of any kind or his basis for suspecting criminal activity.[2] In sum, the trial court found that Officer Nichols had both failed to articulate suspicion, and had articulated suspicion. Because of the incongruity of these findings, we cannot state with any degree of certainty or definiteness whether the trial court found that Officer Nichols articulated suspicion.

In another paradox, the trial court implies that Officer Nichols' abandonment of writing the citation to assist in a dog sniff was evidence that the stop was *not* prolonged, despite this Court's precedent that has held

---

[2] In fact, in the course of the hearing, Officer Nichols never stated that he suspected anyone of anything, short of implying as such from his call to the K-9 after the records search. The Commonwealth never directly addressed, either during Officer Nichols' testimony or subsequently in argument, whether he was suspicious and why. Instead, the Commonwealth at the close of the suppression hearing plainly stated "he had reasonable suspicion." He is never asked, and never articulated, to that effect.

6

numerous times to the contrary. *See, e.g., Turley*, 399 S.W.3d 412; *Davis*, 484 S.W.3d 288*; Moberly*, 551 S.W.3d 26; *Lane*, 553 S.W.3d 203; *Commonwealth v. Mitchell*, 610 S.W.3d 263 (Ky. 2020); *Smith*, 542 S.W.3d 276; *Commonwealth v. Bucalo*, 422 S.W.3d 253 (Ky. 2013).

Regarding whether the stop was extended and whether Officer Nichols had reasonable articulable suspicion, the trial court's limited findings help us only marginally in our review. The trial court's assumptions are at best partially irrelevant, wholly unsubstantiated, and ultimately contradictory on both issues. The record, therefore, does not contain findings which possess "sufficient probative value to induce conviction in the minds of reasonable men," as is required. *Turley*, 399 S.W.3d at 420.

This Court faced a similar problem in *Commonwealth v. Turley* when the trial court made bare-bone, "fatally deficient" findings that contradicted parts of the record on one of the key facts related to whether a stop was prolonged. *Id.* at 418. There, we reprimanded the lower court and called the findings "arbitrary," "incomplete," and "clearly erroneous." *Id.* The Court, in lieu of using the lower court's findings, relied upon the record itself to determine the relevant fact. *Id.* at 420.

Again, in *Commonwealth v. Mitchell*, this Court was faced with the failure of a trial court to make substantial factual findings on a motion to suppress evidence seized during an allegedly prolonged stop. 610 S.W.3d 263, 272 ("The trial court heard this evidence but made no factual findings or conclusions of law on the record supporting or questioning the officers'

reasonable suspicion."). There, the lower court's "written order was sparse, stating only 'considering the motion and testimony and arguments by counsel, the Motion is OVERRULED for the reasons stated on the record.'" *Id.* at 268. The order in *Mitchell* is nearly identical to the order of the trial court herein, and is in fact *more* detailed than the order issued on the motion to reconsider in the instant case.[3] In *Mitchell*, while we held that "neither party argues the trial court's limited findings of fact are clearly erroneous" and we therefore relied upon the record to determine whether or not the stop had been extended, we nonetheless remanded the issue of reasonable articulable suspicion to the lower court for further findings. *Id.* at 272.

As in *Mitchell*, the parties here do not appear to disagree about any facts elicited at the suppression hearing pertinent to this appeal. The parties seem to agree that the testimony of Officer Nichols at the suppression hearing accurately reflected the events of the night. As we did in both *Mitchell* and *Turley*, despite the lack of factual findings by the trial court and absent dispute, we assume the testimony from the suppression hearing is accurate and use the facts elicited during that testimony as the basis for our analysis.

---

[3] Here, the trial court's original order stated, in relevant part, "The Court having heard the testimony and having given due consideration to the motion and for the reasons stated on the record; IT IS HEREBY ORDERED that the motion is OVERRULED."

The order on the motion to reconsider stated simply "IT IS FURTHER ORDERED that the Motion to Reconsider is OVERRULED." Regarding the motion to reconsider, the court made no oral or written findings, despite an initial hearing and post-hearing briefs filed by both parties on the issue.

We therefore progress to review de novo the motion to suppress as a matter of law. *Davis*, 484 S.W.3d at 290.

### III.   ANALYSIS

**1.** ***The traffic stop was extended.***

Police officers may not extend or prolong traffic stops without reasonable, articulable suspicion to conduct further criminal investigation. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Officers who pursue other purposes instead of those associated with the original mission of the stop for any amount of time unconstitutionally prolong the stop. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005). Therefore, a stop is extended when an officer pursues purposes or tasks unrelated to his or her main objective of addressing a traffic violation *and* that new pursuit adds time to the stop. *See Carlisle v. Commonwealth*, 601 S.W.3d 168, 176 (Ky. 2020) (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). Steps taken in pursuit of securing the scene and ensuring officer safety must still relate back to the purpose of the stop or be pursued simultaneously with diligent work on its original purpose. *Id.*; *Rodriguez*, 575 U.S. at 349 ("The officer-safety interest . . . stem[s] from the danger to the officer associated with the traffic stop itself."). In short: An officer must stay on-task, and assisting officers running simultaneous investigations must add no time.

There is no *de minimus* or reasonableness exception to this extension rule. Any unwarranted extension—no matter how short—without reasonable, articulable suspicion violates the Fourth Amendment. *Davis*, 484 S.W.3d at

9

294. A stop may therefore last "no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500 (1983), and even tasks pertaining to that purpose must be diligently pursued. *Lane*, 553 S.W.3d at 206; *see also Rodriguez*, 575 U.S. at 357.

Attending to a traffic violation and conducting a criminal investigation are two separate purposes. For example, pulling someone over and checking their license and registration are squarely within the objectives of issuing a traffic ticket. *Id.* at 355. A dog sniff, by contrast, is a criminal investigation unrelated to addressing a traffic violation. *Id.* ("A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing. . . . Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission."); *Lane*, 553 S.W.3d at 206 ("Obviously, a drug dog sniff search for illegal drugs falls outside the scope of routine traffic law enforcement."); *see also Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000) (finding that a traffic checkpoint at which dogs walked around cars without individualized suspicion was "ultimately indistinguishable from the general interest in crime control" rather than constitutionally related to a traffic stop).

Dog sniffs are criminal investigations. The dissent claims that dog sniffs are legitimate investigative tools, and that their use does not rise to the level of a constitutionally cognizable infringement. *See Caballes*, 543 U.S. at 409. It is true that in a vacuum, dog sniffs are not violative of the Fourth Amendment, just as, in a vacuum, an encounter with a police officer on the street does not

violate the Fourth Amendment. However, that says little about how, in practice, dog sniffs implicate the Fourth Amendment during an otherwise lawful traffic stop.

With few exceptions, because of its character as a task related to criminal investigations, conducting a dog sniff instead of traffic-related duties extends a stop conducted for the original purpose of addressing a traffic violation. *See, e.g., Davis*, 484 S.W.3d 288*; Moberly*, 551 S.W.3d 26; *Lane*, 553 S.W.3d 203; *Mitchell*, 610 S.W.3d 263; *Smith*, 542 S.W.3d 276; *Bucalo*, 422 S.W.3d 253; *cf. Rhoton v. Commonwealth*, 610 S.W.3d 273 (Ky. 2020). In fact, since *Rodriguez*, this Court has only once—in *Rhoton v. Commonwealth*—held that a dog sniff on a vehicle originally stopped for a traffic violation was not an unconstitutional extension of the stop. 610 S.W.3d at 278–79.

In *Rhoton*, we held that the dog sniff was appropriate because "[a] new fact provided independent probable cause to extend the stop" to address Rhoton's outstanding warrant. *Id.* Although the officers in *Rhoton* stopped the vehicle for a traffic infraction, the purpose of the stop shifted to a criminal investigation upon discovering Rhoton's outstanding warrant. *Id.* at 279. The officers then were required to address the warrant by arresting Rhoton and conducting the criminal investigation necessary to address any potentially active criminal activity pursuant to that warrant. *See id.* The officers likewise had "an independent reason to maintain control of the scene given this new information" warranting enhanced security measures. *Id.* By recognizing this new criminal purpose distinct from the traffic stop's original purpose, the

11

officers in *Rhoton* permissibly abandoned their original purpose and conducted a dog sniff. *Id.* Our holding in *Rhoton* is essential for ensuring that officers may diligently and safely pursue new investigative purposes as they arise.

This Court's decision in *Rhoton* more firmly established the line between criminal and traffic-related investigations that was drawn in *Davis v. Commonwealth.* 484 S.W.3d at 292. In *Davis*, an Appellant challenged the trial court's denial of his motion to suppress evidence found following a dog sniff at a traffic stop. *Id.* at 290. There, the officer on duty "was aware of allegations that [Davis] was involved with illegal drugs." *Id.* When Davis drove by, the officer followed him. *Id.* After Davis drove over the center line, the officer pulled him over. *Id.* Following a field sobriety test and breath test (both of which Davis passed), the officer performed a dog sniff on the exterior of the vehicle. *Id.* at 291. The dog alerted. *Id.* Upon a search, the officer found what appeared to be methamphetamine, and Davis was arrested. *Id.* Davis alleged that the dog sniff was an unlawful extension "beyond [the traffic stop's] original purpose." *Id.*

We held in *Davis* that the officer unconstitutionally extended the stop by performing a dog sniff. *Id.* at 292. In *Davis*, this Court shifted its inquiry from "the duration of Appellant's roadside detention" to "whether the sniff search was related to *the purpose* for which Appellant was stopped." *Id.* at 294. Even so, this Court maintained that ultimately the "critical question" was whether the search "adds time to" the stop. *Id.* at 293.

We ultimately found that "the only reason for the sniff search was to discover illegal drugs," and that this was "clearly beyond the purpose" of a DUI

12

stop, even though the Commonwealth argued that finding out whether or not someone is under the influence is related to a search for drugs that may have put the driver under the influence. *Id.* at 294. This Court did not find the Commonwealth's argument persuasive; instead, we held that by conducting the dog sniff, the officer "shifted to a new and different purpose." *Id.* The evidence therefore should have been suppressed. *Id.*

Again, in *Smith*, we considered whether a traffic stop was unreasonably prolonged by a dog sniff. 542 S.W.3d at 281. In *Smith*, an officer who had prior knowledge of Smith's suspected narcotics dealing followed Smith until Smith failed to use a turn signal, prompting the officer to call a K-9 unit to intercept and pull him over. *Id.* at 278–79. Smith was "cooperative, but nervous" when he was confronted. *Id.* at 279. The K-9 officer proceeded to run a dog sniff around his vehicle. *Id.* Drugs were found, and Smith was then arrested. *Id.* The whole encounter took only eight minutes. *Id.* In reviewing the motion to suppress that evidence, this Court held that the officer "abandoned the legitimate purpose of issuing a traffic citation because he immediately asked [Smith] about drugs and launched the dog's sniff search." *Id.* at 282. The shift from traffic citation work to a criminal investigation, absent anything that could have "transformed the situation from a routine stop . . . into a drug trafficking case," necessitated this Court's holding that the stop was unconstitutionally extended. *Id.* at 284.

In one of our most recent cases on this issue, *Commonwealth v. Mitchell*, this Court again considered the validity of a traffic stop interrupted by a dog

13

sniff. 610 S.W.3d at 265. We found that because the original purpose of the stop was correcting a traffic violation, extending the stop to conduct a dog sniff absent any intervening independent cause was unconstitutional. *Id.* at 268 ("It was unrefuted that the officers deferred the completion of the stop beyond its original purpose to discuss then request a canine search."). We held that even inter-officer conferences for training purposes, to the extent that they add time to a stop, must be pursued diligently so as to not unreasonably prolong detention. *Id.* at 270.

We also stated, however, that concurrent operations may provide an exception to our no-extension rule: "When it comes to pursuing unrelated investigative issues, officers must be able to do so while simultaneously completing the purpose of the stop." *Id.* Had one officer continued issuing the citation while another officer simultaneously conducted a dog sniff, that search would have been permissible. *Id.*; *see also Lane*, 553 S.W.3d at 206 ("Without evidence that the traffic stop mission was being diligently pursued . . . we cannot say that the sniff search was conducted concurrently with the traffic stop and thus did not prolong the stop . . . ."); *but cf. Moberly*, 551 S.W.3d at 29 (describing the unconstitutional dog sniffs in *Rodriguez* and *Davis* as "concurrent" as they took place during the course of a traffic stop)[4]; *Davis*, 484

---

[4] *Moberly*'s singular use of the term "concurrent" is misleading. The facts in *Moberly* led the Court to conclude that the stop was extended by a call made to request a K-9 unit, *not* that the dog sniff was done simultaneous with tasks pertinent to the mission of the traffic stop. Rather than "operating at the same time," the Court instead intended to convey that the dog sniff occurred during the course of events initiated by a traffic stop. *Concurrent*, BLACK'S LAW DICTIONARY (11th ed. 2019).

14

S.W.3d at 292 (overruling the holding from *Johnson v. Commonwealth*, 179 S.W.3d 882 (Ky. 2005) that "[a]s long as the sniff search is conducted during the course of a lawful traffic stop, including any lawful extensions of the traffic stop, the search is proper.").

To the extent that language from our precedent may be read to imply otherwise, such a reading is inaccurate. The United States Supreme Court determined in *Illinois v. Caballes* that a dog sniff executed concurrently with diligent traffic-related work did not unduly prolong the stop, even absent independent justification for the dog sniff. 543 U.S. 405, 409 (2005). While *Caballes* preceded the Court's decision in *Rodriguez*, the *Rodriguez* Court explicitly cited to and acknowledged its prior ruling in *Caballes*, stating that "[t]he Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 349 (citing *Caballes*, 543 U.S. at 407).

We acknowledge that the rule we clarify today prioritizes the length of a burden on personal liberty over the depth of its intrusion. This choice is a conscious one, in line with the United States Supreme Court's precedent, that serves to balance the competing interests in the Fourth Amendment and in safe, effective, and proactive policing.

We are bound by the holdings in *Rodriguez* and *Caballes* to permit criminal investigations at traffic stops where they add no time, or where a new purpose is established by reasonable, articulable suspicion. In this case, however, the Commonwealth did not meet its burden to establish that either

15

the stop was not extended because the dog sniff was simultaneous to traffic-related work, or Officer Nichols had reasonable, articulable suspicion to call the K-9 unit.

Taking Officer Nichols' testimony as undisputed, we must conclude that he abandoned writing the traffic citation before completing it in order to aid in a criminal investigation via dog sniff. The Commonwealth does not dispute this fact. Instead, unlike in *Rhoton*, the Commonwealth offers no evidence that a new and independent reason to address an active crime emerged during Officer Nichols' traffic work. In fact, Officer Nichols, the Commonwealth, and the trial court all state explicitly that Officer Nichols stopped working on the traffic citation before completing it, aided in the dog sniff, and then returned to complete the citation. *Smith* is directly on point: In both cases, an officer "abandoned the legitimate purpose of issuing a traffic citation . . . and launched the dog's sniff search." *Smith*, 542 S.W.3d at 282. As we held in *Smith* and absent facts to the contrary, we hold that the stop was extended here.

### 2. *The Commonwealth failed to establish simultaneous missions that permitted the seizure.*

As noted above, simultaneous work on a criminal investigation does not extend or prolong a traffic stop so long as the original purpose is being "diligently pursued." *Lane*, 553 S.W.3d at 206. Officers may therefore diligently pursue "further steps to advance the mission of the traffic stop," including taking information or securing a scene, simultaneous to other work. *Id.* For

16

example, one officer may diligently secure a scene pursuant to a suspended license *while* another officer or officers call or assist a K-9 unit's search.

Even accepting the dissent's implicit argument that Officer Nichols was controlling and securing the scene simultaneous to the dog sniff, we would still be bound by our precedent to hold that on these facts, the stop was extended. *See Turley*, 399 S.W.3d at 424. Where exigent circumstances necessitating officer safety stem from the officer's own actions taken to extend the stop, the resulting seizure is improper. *Id.* Here, the circumstances necessitating Officer Nichols's activities that may be seen as "securing the scene" (including moving Spillman and Clayborne, explaining the situation to the K-9 Unit, describing a dog sniff to Spillman and Clayborne, and standing by during the dog sniff) were a direct result of his call for a K-9 unit in the first place. *See id.* Prior to the K-9 unit arriving, we must assume that Officer Nichols had control over the scene—he testifies to that effect. By leaving his proper purpose behind to assist with a criminal investigation, and without *any* evidence offered by the Commonwealth that the criminal investigation was simultaneous with an officer diligently pursuing the original purpose of the stop, we must conclude that Officer Nichols unconstitutionally prolonged the stop by assisting in the sniff. Regardless, the Commonwealth did not raise such an argument.

The dissent's argument that the search was proper because the driver could not legally drive his car away due to a suspended license is misplaced, and again, the Commonwealth does not raise such an argument. In the instant case, the Commonwealth did not elicit testimony about Officer Nichols' need to

17

move the vehicle or find a new driver, as was the case in *Carlisle v. Commonwealth*, 601 S.W.3d 168. There, an officer directed a car off the road to a safe location after finding that the driver had a suspended license. While the officer secured the vehicle, the driver consented to a search and drugs were found. *Id.* A search by dog was not employed.

In *Carlisle*, we held that the stop was not extended for the search because the lawful purpose of the stop—addressing a suspended license—had not been completed, and during the completion of the purpose of the stop, the officer gained consent to search. *Id.* at 176. The Court in *Carlisle* did not address whether the request to get consent to search the vehicle—or the search itself—extended the stop, since neither party alleged that it had or had not. *Id.* Instead, the Court was tasked with determining whether the "lawful traffic stop had . . . concluded at the time consent was obtained to search the truck," since Carlisle was already told that he would not receive a citation. *Id.* at 176. The Court held that Carlisle was not unlawfully detained past the purpose of the stop when the officer got consent to search. *Id.*

The case we decide today is highly distinguishable from *Carlisle*. This matter concerns a non-consensual dog sniff that halted law enforcement's pursuit of their traffic mission. *Carlisle* involved no dog sniff, and the search in question occurred consensually during an officer's pursuit to secure the scene. We know that the officer in *Carlisle* was securing the scene because he testified to that effect; here, no evidence on the record shows that Officer Nichols was securing the scene.

18

Instead, the testimony reveals that Officer Nichols *stopped* diligently pursuing the purpose of the stop to conduct a criminal investigation. Even work performed to secure the scene must remain on-task. Although Clayborne and Spillman may not have been able to drive the car away, their detention was still extended because all officers attended to the criminal investigation and no officers attended to the traffic citation. Contrary to *Carlisle*, no evidence herein suggests that the scene was being secured pursuant to the suspended license. "Without evidence that the traffic stop mission was being 'diligently pursued,' . . . we cannot say that the sniff search was conducted concurrently with the traffic stop and thus did not prolong the stop beyond what was reasonably required to conduct the traffic stop." *Lane*, 553 S.W.3d at 206. Absent such evidence and given such disparate factual and legal issues, we cannot hold that *Carlisle* determines this case.

A driver's suspended license does not append an officer's duty to work diligently towards the purpose of the stop. At least three officers and one trained narcotics animal attended the scene of Clayborne's ultimate arrest. If even one of those officers had continued diligently working on the issues related to the traffic stop, the seizure of evidence may have been proper. Instead, the Commonwealth has provided nothing on the record through testimony and questioning to indicate that anyone kept working on the traffic stop. In fact, to the contrary, each officer stopped their work on the citation and instead directed their time and attention toward conducting a dog sniff and securing the scene in order to conduct the search. To reiterate, "the

19

Commonwealth bears the burden of establishing the constitutional validity of a warrantless search." *Id.* In the instant case, we cannot conclude that the Commonwealth met its burden of establishing that the stop was not extended and therefore valid. *Id.*

### 3. *The Commonwealth did not meet its burden of establishing reasonable, articulable suspicion.*

As noted, when a stop is prolonged, subsequent seizures may still be proper if the officer had reasonable, articulable suspicion to shift to a criminal investigation. *Moberly*, 551 S.W.3d 26, 31 (Ky. 2018). The reasons for suspicion must be articulated with specificity so that a court may assess whether, on the totality of circumstances, the suspicion was reasonable. *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968). Although "due weight is given to specific reasonable inferences," a reasonable, articulable suspicion must be "more than an unparticularized suspicion or hunch." *Id.* at 27; *Moberly*, 551 S.W.3d at 31. Although criminal history may be a weighty factor in the totality of circumstances, "mere charges do not constitute a 'criminal history' upon which one might reasonably suspect future criminal behavior." *Id.* at 33.

Reasonable, articulable suspicion presupposes that such suspicion is actually articulated by the officer in question. Moreover, under our precedent, the officer's articulation must be specific and particularized. *Id.* at 31. In the absence of that articulation, either explicitly by Officer Nichols or by the trial court, and in the interest of judicial economy, we are left to fill in the gaps with inferences about what specifically the officer found suspicious, and why.

20

In the past, this Court has not found reasonable, articulable suspicion where a subject had a history of criminal charges, was abnormally nervous, persistently looked to one side of his vehicle, and blew smoke into his car while sweating profusely. *Mitchell*, 610 S.W.3d at 272. We did not find it where an officer "was aware of allegations that Appellant was involved with illegal drugs" and had discussed the involvement *that day* with another officer, and additionally the subject stated that "several people had recently used his car, and he did not know what was in it" and had an open can of beer in his car, smelling of alcohol. *Davis*, 484 S.W.3d at 290-91. We did not even find reasonable, articulable suspicion where two officers had collective knowledge of a subject's probable current narcotics dealings (including a credible tip with locations, aliases, and vehicles used to deal), the subject was paroled for past narcotics offenses, and he exhibited nervousness during the stop. *Smith*, 542 S.W.3d at 283–84.

Here, the Commonwealth drew from Officer Nichols' testimony that he saw someone at a car late at night who walked away upon seeing a police vehicle, that the car then began driving, that the driver had a suspended license, and that both occupants had prior narcotics charges. Officer Nichols stated that he saw "nothing transactional" about the interaction at the car. It was repeated at the trial court that all parties—Officer Nichols, Spillman, and Clayborne—were cooperative and cordial. In totality, the Commonwealth's elicited testimony about a car-side conversation, suspended license, and past criminal charges—absent any explanation of why the officer was suspicious, or

21

even the officer's own admission that he *was* suspicious of ongoing criminal activity—does not rise to the level of reasonable suspicion of current criminal activity when compared to our prior caselaw.

Simply put, the Commonwealth failed to meet its burden to show reasonable, articulable suspicion at the suppression hearing. The trial court's contradictory findings on this point show as much. We therefore cannot conclude that Officer Nichols had reasonable articulable suspicion to conduct a dog sniff of Spillman's vehicle.

## IV.    CONCLUSION

Because we hold that the stop was extended, and because that extension was not justified by reasonable, articulable suspicion, we therefore affirm the Court of Appeals.

All sitting. Minton, C.J.; Hughes, Keller and Nickell, JJ., concur. Conley, J., dissents by separate opinion in which Lambert and VanMeter, JJ., join.

CONLEY, J., DISSENTING: With due respect to the majority of my colleagues, I cannot acquiesce in the majority opinion. I believe because the traffic stop was legitimate at its inception and the law gives Officer Nichols the authority to prevent Spillman's vehicle from being unlawfully driven, the dog sniff did not prolong the traffic stop. This conclusion fits squarely within *Carlisle*'s framework. 601 S.W.3d at 176. The majority opinion's distinctions against *Carlisle*'s application are unpersuasive before this simple truth: "[p]reventing [Spillman and Clayborne] from driving off without a license is

22

lawful enforcement of the law, not unlawful detention." *United States v. Vargas*, 848 F.3d 971, 974 (11th Cir. 2017). Combined with the fact that a dog sniff is a legitimate investigative tool and was conducted properly on the exterior of Spillman's vehicle, "[a]ny intrusion on [Clayborne's] privacy expectations [do] not rise to the level of a constitutionally cognizable infringement." *Caballes*, 543 U.S. at 409.

I respectfully dissent.

Lambert and VanMeter, JJ., join.

COUNSEL FOR APPELLANT:

Daniel J. Cameron
Attorney General of Kentucky

James Coleman Shackelford
Assistant Attorney General


COUNSEL FOR APPELLEE:

Erin Hoffman Yang
Assistant Public Advocate
Department of Public Advocacy

# Supreme Court of Kentucky

## 2020-SC-0058-DG

COMMONWEALTH OF KENTUCKY                 APPELLANT

ON REVIEW FROM COURT OF APPEALS

V.                           NO. 2019-CA-0140

FAYETTE CIRCUIT COURT NO. 17-CR-00668

IKIA ANDERSON CLAYBORNE             APPELLEE

## ORDER GRANTING PETITION FOR MODIFICATION

The Petition for Modification, filed by the Appellant, of the Opinion of the Court, rendered September 30, 2021, is GRANTED and the attached modified Opinion of the Court is hereby ORDERED SUBSTITUTED for the Opinion originally rendered. This modification does not affect the holding of the original Opinion.

All sitting. All concur.

ENTERED: December 16, 2021.

_____

CHIEF JUSTICE